**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE**

| | |
|---|---|
| MICHAEL NINIVAGGI, JAKE MICKEY and CAILIN NIGRELLI, individually and on behalf of all others similarly situated, | Civil Action No. 20-cv-1478-SB |
| *Plaintiffs*, | |
| v. | |
| UNIVERSITY OF DELAWARE, | |
| *Defendant*. | |
| HANNAH RUSSO, individually and on be-half of all others similarly situated, | Civil Action No. 20-cv-1693-SB |
| *Plaintiff*, | |
| v. | |
| UNIVERSITY OF DELAWARE, | |
| *Defendant*. | |

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF
THEIR MOTION FOR CLASS CERTIFICATION**

**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
Robert J. Kriner, Jr. (#2546)
2711 Centerville Road, Suite 201
Wilmington, DE 19808
(302) 656-2500

*Counsel for Plaintiffs*

Dated: July 1, 2022

## <u>TABLE OF CONTENTS</u>

**PAGE(S)**

NATURE AND STAGE OF THE PROCEEDINGS ................................................................... 1

SUMMARY OF ARGUMENT ...................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 1

I.     UD MADE IN-PERSON CLASSES PART OF THE BARGAIN................................... 2

II.    UD DID NOT PROVIDE STUDENTS WITH IN-PERSON CLASSES FOR THE
ENTIRE SPRING 2020 SEMESTER.................................................................. 7

III.   UD CANCELLED SEVEN DAYS OF CLASSES .................................................. 10

LEGAL STANDARD................................................................................................ 11

ARGUMENT ....................................................................................................... 12

I.     THE PROPOSED CLASS SATISFIES RULE 23(a).............................................. 12

      A.   Numerosity ................................................................................. 12

      B.   Commonality............................................................................... 12

      C.   Typicality .................................................................................. 13

      D.   Adequacy .................................................................................. 13

II.    THE PROPOSED CLASS SATISFIES RULE 23(b)(3)................................................ 14

      A.   Common Questions of Fact Predominate ............................................ 15

      B.   A Class Action Is Superior To Thousands Of Individual Actions...................... 19

      C.   The Class Is Ascertainable................................................................ 20

CONCLUSION..................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

PAGE(S)

**CASES**

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ............................................................................................ 12, 19

*Baby Neal v. Casey*,
  43 F.3d 48 (3d Cir. 1994) ............................................................................................ 13

*Beck v. Maximus, Inc.*,
  457 F.3d 291 (3d Cir. 2006) ....................................................................................... 13

*Byrd v. Aaron's Inc.*,
  784 F.3d 154 (3d Cir. 2015) ....................................................................................... 20

*Chesner v. Stewart Title Guar. Co.*,
  2008 WL 553773 (N.D. Ohio Jan. 23, 2008) ............................................................ 17

*Gen. Tel. Co. of Sw. v. Falcon*,
  457 U.S. 147 (1982) .................................................................................................... 12

*Hadley v. Kellogg Sales Co.*,
  324 F. Supp. 3d 1084 (N.D. Cal. 2018) ..................................................................... 19

*Hurwitz v. LRR Energy L.P.*,
  2018 WL 6804481 (D. Del. Jan. 2, 2018) ................................................................. 20

*In re Community Bank of Northern Virginia*,
  418 F.3d 277 (3d Cir. 2005) ....................................................................................... 16

*In re Dial Complete Mktg. & Sales Pracs. Litig.*,
  320 F.R.D. 326 (D.N.H. 2017) ................................................................................... 19

*In re Hydrogen Peroxide Antitrust Litig.*,
  552 F.3d 305 (3d Cir. 2008) ................................................................................. 12, 15

*In re Modafinil Antitrust Litig.*,
  837 F.3d 238 (3d Cir. 2016) ....................................................................................... 12

*In re Prudential Ins. Co. Am. Sales Practice Litig.*,
  148 F.3d 283 (3d Cir. 1998) ....................................................................................... 13

*In re Schering Plough Corp. ERISA Litig.*,
  589 F.3d 585 (3d Cir. 2009) ....................................................................................... 13

*In re Wilmington Tr. Sec. Litig.*,
  310 F.R.D. 243 (D. Del. 2015) ................................................................................... 19

*Kashmiri v. Regents of Univ. of California*,
    156 Cal. App. 4th 809 (2007) ........................................................ 17

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) ........................................................... 18

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir.2001) .......................................................... 14

*Ninivaggi v. Univ. of Delaware*,
    555 F. Supp. 3d 44 (D. Del. 2021) ............................................ 1, 16

*Ortez v. Michael P. Morton, P.A.*,
    2019 WL 1417156 (D. Del. Mar. 29, 2019) ................................... 12

*Ridley v. Bayhealth Med. Ctr., Inc.*,
    2018 WL 1567609 (Del. Super. Ct. Mar. 20, 2018) ....................... 16

*Skeway v. China Nat. Gas, Inc.*,
    304 F.R.D. 467 (D. Del. 2014) ...................................................... 18

*Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) .......................................................... 12

*Well Thrive Ltd. v. Semileds Corp.*,
    2020 WL 7490109 (D. Del. Dec. 21, 2020) ................................... 18

*Yoon v. Gap, Inc.*,
    2010 WL 11597565 (C.D. Cal. Oct. 6, 2010) ............................... 17

**RULES**

Fed. R. Civ. P. 1 ............................................................................ 20

Fed. R. Civ. P. 23 ..................................................................... 11, 12

Fed. R. Civ. P. 23(a) ......................................................... 1, 11, 12, 14

Fed. R. Civ. P. 23(a)(2) ................................................................. 12

Fed. R. Civ. P. 23(a)(3) ................................................................. 13

Fed. R. Civ. P. 23(b) ..................................................................... 12

Fed. R. Civ. P. 23(b)(3) ........................................................... passim

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiffs Michael Ninivaggi, Jake Mickey and Cailin Nigrelli filed their initial Complaint on August 14, 2020, and Plaintiff Hannah Russo filed her original Complaint on November 18, 2020.  On August 20, 2021, the Court granted Defendant University of Delaware's ("Defendant" or "UD") motion to dismiss Plaintiffs' conversion claim and request for punitive damages, but otherwise denied UD's motion to dismiss.  ECF No. 20.  Plaintiffs filed a Consolidated Class Action Complaint on September 3, 2021.  ECF No. 19.  Now, following fact discovery, Plaintiffs move for class defined as: "All undergraduate students enrolled in classes at the University of Delaware during the Spring 2020 semester who paid tuition."

## SUMMARY OF ARGUMENT

1.      Plaintiffs satisfy the numerosity, commonality, typicality, and adequacy requirements of Fed. R. Civ. P. 23(a).

2.      Plaintiffs satisfy the requirements of Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to the class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  In addition, the class is ascertainable.

## STATEMENT OF FACTS

The University of Delaware was founded in 1743.  Ex. 87 (Morgan Dep.) at 102:16-18. In the 277 years that followed, two things were always true: UD always provided its students with in-person classes and UD always provided its students with access to its campus.  Ex. 87 (Morgan Dep.) at 104:3-10 ████████████████████████████████

████).  Indeed, for centuries, students and schools have understood that college courses are taught in person and on campus.  Students "trudge bleary-eyed to their 8 a.m.'s, down caffeine during all-nighters in the library with their study groups, and run from one campus building to

another in between.  That is what it means to go '*off to* college.' "  *Ninivaggi v. Univ. of Delaware*, 555 F. Supp. 3d 44, 51 (D. Del. 2021) (original emphasis).  In other words, the course of dealing between UD and its students, as well as the way that UD markets itself to prospective students, leaves little doubt that access to these in-person services was an indispensable part of the bargain between the school and students who paid tuition.

## I.   UD MADE IN-PERSON CLASSES PART OF THE BARGAIN

UD has consistently made it clear that in-person classes are part of the service that it provides to students.  In fact, as former UD Provost Robin Morgan explained at her deposition, the University requires its students to spend time on the campus:



Ex. 87 (Morgan Dep.) at 111:7-112:7.

Likewise, UD's course search website specifically noted that the vast majority of its classes were to be taught "In Person" as opposed to "Online":



Ex. 63; Ex. 87 (Morgan Dep.) at 122:8-10.  That same course search website also stated what campus and rooms classes would be in.  Exs. 62, 64.  And so, prior to the Spring 2020 semester, when students signed up for their classes, they registered for classes with the location and mode of instruction that that they preferred.  Ex. 87 (Morgan Dep.) at 123:18-23.  And, for Spring 2020, the vast majority of UD students chose in-person classes.  Ex. 68 ███████████████ ████████████████████████████████

    Other portions of the UD website also made it clear that in-person classes and access to the UD campus were fundamental aspects of what the University would provide its students. The "Experience UD" webpage, geared towards prospective students, states that "[t]he best way to experience the University of Delaware is to see it yourself."  Ex. 1.  UD then boasts that "[t]he Newark campus, called 'absolutely the most gorgeous anywhere' in *The Princeton Review*, features a pleasing mix of elegant landscaping, classic Georgian architecture and modem, state-of-the-art teaching, research and performance spaces."  *Id.*  The University's Statement of Respect & Responsibility commits to ensuring "a welcoming campus culture."  Ex. 2. Defendant's webpage on "The UD Community" touts that "UD is the place to hear world-renowned speakers, enjoy first-rate music and theatre, cheer on Fightin' Blue Hens teams and see compelling exhibits, all of which complement the rich academic experience."  Ex. 3.

    UD's descriptions for its majors similarly indicated that classes would be taught in-person and/or that they would involve in-person laboratories or other in-person and hands-on experiences.  By way of example:

- "UD's central east coast location and the Lerner College's variety of experience-driven learning opportunities make the UID accounting degree a central part of your successful future in any accounting-related profession."  Ex. 6.

- The Animal biosciences degree has "the added benefits of extensive hands-on animal experience and the opportunity to do laboratory or farm-based research."  Ex. 8.

- "Even before they begin student teaching our candidates complete over 75 hours of classroom experience tutoring, mentoring and teaching adolescents in local secondary schools.  In their senior year candidates participate in a year-long placement in the middle or high school where they will complete their student teaching."  Ex. 9.

- "With a locked-step curriculum, the [Applied Molecular Biology and Biotechnology] program will emphasize hands-on training and practical experience . . . ."  Ex. 10.

- "Beginning in their first year, [Biomedical Engineering] students are exposed to the engineering design process [and] hands-on lab skills . . . ."  Ex. 15.

- "Students gain real-world experience, on our children's campus . . . working with young children from diverse backgrounds and with special needs."  Ex. 20.

- "Undergraduate laboratory experiences give students the chance to practice skills they learn in classes on real devices and to see firsthand the physics that they describe mathematically in classes.  Because of our lab courses, upon graduation our students not only understand the technical world but also have the skills and experience to change it."  Ex. 23.

- "The Patrick T. Harker Interdisciplinary Science & Engineering Laboratory brings together teaching, learning and research in an integrated way, so that research informs the curriculum content and students learn by exploring real-world problems.  The Mechanical Engineering Design Studio is a 3,500 square-foot 'maker-space' for group projects, computer-aided design, prototyping and design validation.  It is a community space that is open 24-7 for mechanical engineering students and their collaborators."  Ex. 25.

- "Our unique, state-of-the-art Center for Experimental and Applied Economics allows students to study, develop, and conduct experiments in behavioral economics."  Ex. 27.

- "Opportunities abound for environmental engineering undergraduates to work with faculty and graduate students in our world-class research program."  Ex. 28.

- "The undergraduate research experiences, hands-on learning in the classroom and close collaboration with environmental experts that you will have in the environmental science major will appeal to employers and graduate programs trying to balance the needs of citizens with environmental sustainability and conservation.  In addition to rigorous traditional classroom and laboratory studies, you will be able to study in locations as close as White Clay Creek—a wild and scenic river whose tributaries begin on campus—to as far as the polar regions or tropical islands while studying abroad during winter session."  Ex. 29.

- "You will be part of a program with strong connections between faculty and students in classroom and laboratory settings, on research projects and in club activities.  Invent an ice-cream flavor and perform sensory and market analysis of your new flavor at the UDairy Creamery.  Perform research in one of our food safety labs. . . ."  Ex. 31.

4

- "Our two on-campus learning labs include Vita Nova, a student-run gourmet restaurant, and the Courtyard by Marriott's Lodging Module.  In these labs, you'll gain hands-on, real-world experience of the hospitality industry."  Ex. 32.

- "Join our Insect Ecology and Conservation major and experience a hands-on education that will empower you to make a difference in the stewardship of our planet."  Ex. 34.

- "Students in the marine science bachelor's program benefit from resources on the main campus in Newark . . . .  With small class sizes, our students can personalize their education and gain hands-on research experience."  Ex. 35.

- "Students in [the Medical Laboratory Science] major complete experiential learning through clinical education in laboratories at the program's hospital and private affiliates."  Ex. 36.

- "To support the student experience, a state-of-the-art clinical simulation laboratory and resource center allow [Nursing] students to pursue independent and collaborative coursework."  Ex. 37.

- "Experiential opportunities are available in and out of the classroom. . . .  Courses include hands-on labs and real world experiences in food service, community and simulated medical settings."  Ex. 38.

- "You'll experience in-the-field, hands-on training, applying classroom concepts to solve real OM problems during the capstone course and at multiple plant site trips."  Ex. 40.

- "Classes are small and interactive to provide students ample hands-on opportunities to build skills and practice leadership strategies."  Ex. 41.

- "Experiential learning is the cornerstone of [the Plant Science] major.  Your collaboration with faculty will include a hands-on approach along with one-on-one interactions both in and out of the classroom. . . .  [O]ur 350-acre outdoor classroom which includes state-of-the-art greenhouses, gardens and research laboratory facilities are located right on our main campus.  In addition, you will have access to our unique state-of-the-art Delaware Biotechnology Institute. . . ."  Ex. 42.

- "Students work side-by-side with faculty and professionals to address challenges facing communities and organizations using learning from the classroom."  Ex. 45.

- "Clinical observational experiences working with UD's high-level NCAA Division I student-athletes and clinical staff are among the strengths of UD's educational program. . . .  The Health Science brand is alive and well in UD's College of Health Sciences, positioned strategically on the STAR Campus among the contemporary and state-of-the-art health education facilities."  Ex. 46.

Furthermore, a picture is worth a thousand words.  The UD webpages for its numerous

departments show students in physical classrooms, laboratories and studio settings:



Exs. 9-46.  In stark contrast, UD has an entirely separate section of its website for its Online

Program, with a picture of a student in front of his tablet computer:



UD Online Featured Programs

Ex. 60.

UD also holds itself out as a ████████████   Ex. 87 (Morgan Dep.) at 102:6-15.



█  ████████████████

*Id.* at 64:2-18.  Notably, UD has now largely transitioned back to in-person classes because it is

████████████████  and its  ██████████████████████████████████

████████████████████████████████  *Id.* at 102:6-15.

## II.    UD DID NOT PROVIDE STUDENTS WITH IN-PERSON CLASSES FOR THE ENTIRE SPRING 2020 SEMESTER

In Spring 2020, in UD's 278th year, things suddenly changed.  On March 11, 2020, in light of the emerging COVID-19 pandemic, UD announced that it was cancelling classes for the next two days and that Spring Break would be moved up a week.  Ex. 48.  Then, on March 13, 2020, UD President Dennis Assanis announced that the school would close the residence halls and that all courses would transition to remote learning for the remainder of the semester.  Ex. 51.  On March, 15, 2020, President Assanis extended Spring Break an additional week.  Ex. 52. Accordingly, from March 12, 2020, through to the end of the semester, UD did not provide students with any in-person classes and it denied them access to the campus.  Ex. 87 (Morgan Dep.) at 94:17-95:23  ██████████████████████████████████████

██████████████████

UD made it clear that denying students in-person classes and access to the campus was not what the parties had agreed to.  In a speech to the UD community, President Assanis noted "this is definitely not how we envisioned our Spring semester.  We all miss being together with you on a beautiful campus."  Ex. 66.  Provost Morgan was even more blunt, urging faculty to

██████████████████████████████████████████████

██████████████████████████████  Ex. 74 (emphasis added).

The transition to online-only classes represented a major change for UD and its students. Provost Morgan acknowledged that  ████████████████████████████

█████████ in part because UD ███████████████████████████████████████ Ex. 87
(Morgan Dep.) at 93:19-94:4 ████████████████████████████████████████████
Ex. 56 ████████████████████████████████████ President Assanis noted that "our
entire world ha[d] changed dramatically" and that the University "had to take a series of
unprecedented measures . . . ."  Ex. 66.  Provost Morgan added that the transition ████████



██████████████████████████ Ex. 68; Ex. 87 (Morgan Dep.) at 136:16-18 ███████████

███████████████████████████████████ *id.* at 138:20-24 █████████████████

███████████████████████████ Ex. 70 ███████████████████████████

Ex. 73 ████████████████████████████████████████

; Ex. 73 ███████████████████████████████████████

████████████████████████████████████████████████

Ex. 75 ████████████████████████████████████████████████

███████████████████████████████████████ *id.* █████████████████

████████████████████████; Ex. 77 ████████████████████

█████████████████████████████████

   In recognition of the significant mid-semester change to its courses, UD offered students
the ability to transition to a pass/no record grading option.  Ex. 87 (Morgan Dep.) at 91:7-92:17.
Likewise, in light of the upheavals during Spring 2020, UD extended its tenure/contract clock

and professors were permitted to exclude student course feedback from their evaluations.  Ex. 67.  Ex. 87 (Morgan Dep.) at 134:6-8 ██████████████████████████████████

██████████████████████████████████████████████

In other words, prior to the pandemic, it had been the understanding of both the University and its students that UD would provide in-person classes for the entirety of the Spring 2020 semester.  UD has also acknowledged that its online classes were not equivalent to the usual in-person experience with access to the campus. ████████████████████

████████████████████████████████████████████ Ex. 51.



Ex. 87 (Morgan Dep.) at 88:19-89:16.  The official UD Twitter account noted that it was "hard not being on campus," and that it had "been a challenging semester."  Ex. 55; Ex. 58; Ex. 66 ("It's been very hard for everyone in our community.")

In a blow to graduating seniors, commencement in Spring 2020 was also entirely remote:



Ex. 87 (Morgan Dep.) at 109:13-110:6; Ex. 59 ("We know graduation celebrations look a bit

different than we thought . . . .").

While UD extended the period for students to withdraw from classes, it did not offer or give students any refunds, even if they withdrew.  Ex. 87 (Morgan Dep.) at 84:6-12.  In fact, UD provided students with no tuition refunds whatsoever in Spring 2020.  *Id.* at 160:16-18.

███████████████████████████████████████████████████████

██████████████████████████████████████████ Ex. 82; Ex. 87 (Morgan

Dep.) at 177.

Numerous students and their parents complained to UD about online classes and the lack of a refund.  *See, e.g.*, Ex. 80 ██████████████████████████████████

█████████████████████████████████████ Ex. 81 ██████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████ Ex. 83

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████ Ex. 84 ██████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████ Ex. 87 (Morgan Dep.) at 173:22-174:1 ████

█████████████████████████████████████████████████████████

████████████

## III.   UD CANCELLED SEVEN DAYS OF CLASSES

Originally, UD's Spring break was scheduled to start on March 27, 2020 and last for one week.  Ex. 49.  On Wednesday March 11, 2020, however, the University announced that it was suspending classes for the remainder of that week and also moving up the start of Spring break

by a week, extending it to two weeks.  Ex. 50.  These changes to the schedule shortened the

Spring 2020 semester by seven class days, but UD neither extended its schedule on the back end

nor refunded students for this shortfall:



Ex. 87 (Morgan Dep.) at 86:14-18; Exs. 49-50 (showing that the last day of classes and the exam

period remained the same).  UD provided no refund for these seven class days that it failed to

provide in any form.

## LEGAL STANDARD

To obtain class certification, Plaintiffs must establish the four elements of Rule 23(a)

along with one subpart of Rule 23(b).  Fed. R. Civ. P. 23.  Under Rule 23(a), Plaintiffs must

show that: (1) the class is so numerous joinder of all the members is impracticable

("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3)

the parties' claims or defenses are typical of the class ("typicality"); and (4) the representative

parties fairly and adequately protect the interests of the class ("adequacy").  *Warfarin Sodium*

*Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir. 2004).  Once the requirements of Rule 23(a) are met,

Plaintiffs must show that the class can be maintained under any one of three subparts in Rule

23(b).  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  Here, Plaintiffs seek

certification under subpart (b)(3), which requires the Court to find that "questions of law or fact

common to class members predominate over any questions affecting only individual members,"

and that "a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "Class certification is proper only 'if the

trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met."  *In re*

*Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).

**ARGUMENT**

**I.   THE PROPOSED CLASS SATISFIES RULE 23(A)**

**A.   Numerosity**

"The United States Court of Appeals for the Third Circuit has found that, generally, if the plaintiff demonstrates that the potential number of class plaintiffs is greater than 40, the first prong of Rule 23(a) has been met." *Ortez v. Michael P. Morton, P.A.*, 2019 WL 1417156, at *4 (D. Del. Mar. 29, 2019) (citing *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 249-50 (3d Cir. 2016)).  Here, numerosity is satisfied because 17,138 undergraduate students paid UD tuition to attend the Spring 2020 Semester.  Ex. 88 (Def.'s Answers And Objections To Pls.' First Set Of Interrogatories) at No. 4.

**B.   Commonality**

Commonality requires a plaintiff to establish that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "A finding of commonality does not require that all class members share identical claims."  *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 310 (3d Cir. 1998).  Rather, commonality is satisfied when "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."  *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

Here, Plaintiffs' breach of contract claim turns on whether UD was bound to provide students with in-person classes and access to its campus.  That claim also depends on whether UD breached its contract with students by delivering online classes instead, excluding students from the campus and cancelling seven days of classes.  Likewise, Plaintiffs' unjust enrichment claim turns on whether it was unjust for UD to retain the entirety of their tuition payments even

12

though it failed to provide in-person classes for the entirety of the Spring 2020 semester.  These questions and their answers will be the same for every member of the class.  If UD was contractually bound to provide in-person classes to Plaintiffs, it was also contractually bound to provide in-person classes to the rest of the class because UD engaged in the same course of conduct for all students and so the same contractual terms govern.  If UD breached its agreement with Plaintiffs, it breached its agreement with all other class members.  Likewise, if it was unjust for UD to retain all of Plaintiffs' tuition, it was unjust for UD to do so with all of the other class members as well because the circumstances are indistinguishable.  In other words, the same central questions are common for all class members.

### C.    Typicality

A proposed class representative is not typical under Rule 23(a)(3) if "the representative is subject to a unique defense that is likely to become a major focus of the litigation."  *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3d Cir. 2009) (quoting *Beck v. Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006)).  Here, none of the named Plaintiffs are subject to any unique defense, let alone one that will be that major focus of this litigation.  To the contrary, they are each typical of the rest of the class because they were each undergraduate students at UD in Spring 2020, they each paid tuition (whether through loans, with the assistance of parents or out of their own pockets) and UD failed to provide each of the them with a full semester of in-person classes.  Ninivaggi Decl. ¶¶ 4-9; Mickey Decl. ¶¶ 4-9; Nigrelli Decl. ¶¶ 4-9; Russo Decl. ¶¶ 4-9.

### D.    Adequacy

To meet the adequacy requirement under Rule 23(a), the district court must find that (1) the class representatives' interests do not "conflict with those of the class," and (2) the proposed class counsel are "capable of representing the class."  *Newton v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.*, 259 F.3d 154, 185 (3d Cir.2001).

Here, there is no evidence that the named class representatives' interests are antagonistic to other class members' interests as everyone stands to potentially recover the same amount. Moreover, Plaintiffs have demonstrated their adequacy and commitment to vigorously prosecuting this action by performing their duties as named plaintiffs.  In that regard, Plaintiffs have been in regular communication with their counsel about the progress of this case, reviewed documents filed on their behalf in order to remain updated on the status of this case and they have searched for and collected documents relevant to this action.  Ninivaggi Decl. ¶¶ 11-13; Mickey Decl. ¶¶ 11-13; Nigrelli Decl. ¶¶ 11-13; Russo Decl. ¶¶ 11-13.  In addition, Plaintiffs have all sat for depositions.

Plaintiffs have also hired class counsel who have extensive experience litigating class action claims.  Ex. 89 (Bursor & Fisher, P.A. Firm Resume); Ex. 90 (Chimicles Schwartz Kriner & Donaldson-Smith LLP Firm Resume); Ex. 91 (Anastopoulo Law Firm, LLC Firm Resume); Ex. 92 (Cross & Simon, LLC Firm Resume).  Plaintiffs' counsel have been appointed class counsel in dozens of cases in both federal and state courts, including in several other tuition refund cases.  Ex. 89 at 1-5.  They have won multi-million dollar verdicts or recoveries in six of six class action jury trials since 2008.  They have also been vigorously prosecuting this action through discovery and litigation of Defendant's motions to dismiss, have retained experts, conducted substantial research regarding the legal issues, and thoroughly investigated the factual issues in this action.  They have no conflicts of interest and will prosecute this action vigorously on behalf of Plaintiffs and the Class.  Plaintiffs' counsel are well-funded law firms that are willing and able to bear the costs associated with maintaining this class action.

## II.    THE PROPOSED CLASS SATISFIES RULE 23(b)(3)

The twin requirements of Federal Rule of Civil Procedure 23(b)(3) are known as

predominance and superiority.  *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310 (3d Cir. 2009).  In determining whether questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy, the Court considers matters pertinent to these findings:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  Here, Plaintiffs satisfy both requirements.

### A.    Common Questions of Fact Predominate

Rule 23(b)(3)'s predominance element requires that common issues predominate over the issues applying only to individual members of the proposed class.  Although common issues must predominate over individual inquiries, the existence of an individual inquiry does not preclude class certification, especially where all members face the necessity of proving the same conduct.  *See In re Community Bank of Northern Virginia*, 418 F.3d 277, 306 (3d Cir. 2005) Similarly, individualized damages calculations do not defeat a Rule 23(b)(3) certification if the predominance requirement is otherwise met.  *Id.* at 305-06.

"[T]o prevail on a theory of implied-in-fact contract, a plaintiff must establish that the parties, through their actions, demonstrated a meeting of the minds on all essential terms."  *Ninivaggi v. Univ. of Delaware*, 555 F. Supp. 3d 44, 49 (D. Del. 2021) (quoting *Ridley v. Bayhealth Med. Ctr., Inc.*, 2018 WL 1567609, at *7 (Del. Super. Ct. Mar. 20, 2018)).  "To do so, the plaintiff may rely on evidence like the parties' 'course of dealing or usage of trade or course of performance.' "  *Id.* (quoting Restatement § 4 cmt. a).  Documents to be considered in that

15

analysis include, but are not limited to, "the school's course catalog or student handbook." *Id.* But the Court has also recognized that "[s]chools and students show their intent to contract mostly through their actions, not words: the school admits them, the students enroll and pay tuition, and the students go to class." *Id.*

Here, this analysis presents a common question with a common answer for the entire class. All of the available evidence demonstrates a course of conduct by both UD and its students under which all parties understood that UD would provide in-person classes. From its founding in 1743 through the beginning of the Spring 2020 semester, UD had always provided its students with in-person classes, as opposed to exclusively online or correspondence classes, and UD students had always gone "*off* to college." UD holds itself out as a ████████████ with a residency requirement and where the expectation is that the education is largely hands-on, experiential and in-person. Ex. 87 (Morgan Dep.) at 111:7-112:7. UD's course website specifically listed most of the classes in Spring 2020 as in-person. Exs. 62-64, 68; Ex. 87 (Morgan Dep.) at 122:8-10. In advertising to prospective students, UD touted its beautiful campus and facilities. Ex. 1. UD described numerous majors as providing hands-on experiences in laboratories and other facilities. Exs. 6-46. Its website was replete with pictures of students and teachers together in-person in physical classrooms.

This course of dealing did not differ from student to student. UD did not tell some students that they could take in-person classes and access the campus and others that they could not. Rather, UD offered a uniform product to all its students, and an essential component of the product was in-person classes and access to the UD campus. Likewise, when UD moved to online classes in the middle of the Spring 2020 semester, it breached its contract with all students and none of the undergraduate students at UD received the full semester of the in-person classes

16

and access to the campus that they paid for.  Where, as here, a defendant offered a standard product, courts have not hesitated from certifying an implied-in-fact contract claim.  *See, e.g.*, Ex. 94 (Class certification order in *Weiman v. Miami University*; Case No. 2020-00614JD (Oh. Ct. Claims)) (certifying breach of implied-in-fact contract claims); Ex. 95 (Class certification order in *Smith v. The Ohio State University*, Case No. 2020-00321JD (Oh. Ct. Claims)) (same); Ex. 96 (Class certification order in *Waitt v. Kent State University*, Case No. 2020-00392JD (Oh. Ct. Claims)) (same); Ex. 97 (Class certification order in *Duke v. Ohio University*, Case No. 2021-00036JD (Oh. Ct. Claims)) (same); Ex. 98 (Class certification order in *Keba v. Bowling Green State University* (Oh. Ct. Claims)) (same); *Kashmiri v. Regents of Univ. of California*, 156 Cal. App. 4th 809, 831 (2007) (affirming enforcement of an implied-in-fact contract between a class of students and a University); *Chesner v. Stewart Title Guar. Co.*, 2008 WL 553773 (N.D. Ohio Jan. 23, 2008) (certifying claims based on an implied contract for title insurance); *Yoon v. Gap, Inc.*, 2010 WL 11597565, at *4 (C.D. Cal. Oct. 6, 2010) ("[T]here is a common question of whether payment of $60 by any and all customers constituted an implied-in-fact contract for Gap to provide a $20 Shopping Card without further spending conditions.").

Plaintiffs' unjust enrichment claim is equally susceptible to classwide treatment.  "The elements of unjust enrichment under Delaware law are: '(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law.' "  *Well Thrive Ltd. v. Semileds Corp.*, 2020 WL 7490109, at *9 (D. Del. Dec. 21, 2020) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)).  Here, Defendant was enriched by every class member (and every class member was impoverished) because they each paid tuition for the Spring 2020 semester. Whether UD had a justification for failing to refund students for the transition from in-person

17

classes to online classes can be decided on a classwide basis; either the failure to refund was unjustified for all students or it was not.  Litigation of this issue will turn on common evidence, without any individual inquiry whatsoever.  Likewise, class members either have a remedy at law (via a breach of contract claim) or they do not.

Plaintiffs' experts have also set out the methods that they will use to measure damages on a classwide basis.  *But see Skeway v. China Nat. Gas, Inc.*, 304 F.R.D. 467, 476 (D. Del. 2014) (predominance satisfied where the "only issue requiring individual treatment will be the computation of damages for the Class members").  First, Plaintiffs' survey expert, Steven P. Gaskin, has designed "a market research survey and analysis" that will enable him "to assess the extent of any reduction in market value resulting from the Closure of the University Campus (measured in dollars and/or percentage terms), meaning the difference in market value between in-person classes and full access to the University's campus and facilities, compared to the market value of virtual classes and no access to the University's campus or facilities . . . ." Gaskin Decl. ¶ 10.  Mr. Gaskin's chosen methodology for this survey is a conjoint analysis.  *Id.* "[C]onjoint analysis is a well-accepted economic methodology" that is commonly used to measure damages in consumer class actions.  *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1107-09 (N.D. Cal. 2018) (quoting *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 331 (D.N.H. 2017) (collecting cases holding same)).  Plaintiffs' damages expert, Colin B. Weir, will then calculate the tuition overpayment by taking the overpayment factor identified by Mr. Gaskin through the conjoint survey (expressed as a percentage) and multiplying it against the total tuition that the class paid for the Spring 2020 semester (prorated for the time period at issue).  Weir Decl. ¶¶ 44-46.  In addition, damages for missed days will be calculated on a prorated basis.  *Id.* ¶¶ 47-48.

18

### B.      A Class Action Is Superior To Thousands Of Individual Actions

In determining whether a class action is the superior method of adjudication, the relevant considerations include: "(a) the interest of members of the class individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating litigation of the claims in the particular forum; and (d) the difficulties likely to be encountered in the management of the class action." *In re Wilmington Tr. Sec. Litig.*, 310 F.R.D. 243, 245 (D. Del. 2015) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997)). "The Supreme Court has noted that the dominant purpose behind certifying Rule 23(b)(3) cases is to vindicate the rights of people who individually would be without the strength to bring their opponents into court; it overcomes the problem of small recoveries, which do not provide enough incentive for individual actions to be prosecuted. *Id.* (citing *Amchem* at 617).

Here, the only alternative to this class action is tens of thousands of individual lawsuits. Accordingly, a "Fed. R. Civ. P. 23(b)(3) action is superior to other available methods—such as thousands of small trials challenging the same alleged [conduct]—which will not fairly and efficiently resolve this controversy under Fed. R. Civ. P. 1." *Hurwitz v. LRR Energy L.P.*, 2018 WL 6804481, at *3 (D. Del. Jan. 2, 2018); 1/21/2022 Decision at 15 in *Smith v. The Ohio State University*, 2020-00321JD (Oh. Ct. Cl.) (holding, in a similar tuition case, "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy presented by Plaintiff . . . ."). Manageability of this class action is also not a concern given that class members can be easily identified and notified using Defendant's records. Moreover, if any class members have an interest in litigating this case separately, they will be entitled to opt out of the class.

## C.      The Class Is Ascertainable

A class is ascertainable when (1) it is "defined with reference to objective criteria"; and (2) there is "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). Here, the proposed class meets these requirements. The definition is based exclusively on objective criteria: either students attended UD as undergraduates during the Spring 2020 semester or they did not. Likewise, they either paid tuition or they did not. Class members can be easily identified using Defendant's records. UD knows who attended its school and which students paid tuition (whether through their own finances, or with the assistance of parents and/or loans) and which received a "free ride" through financial aid. *See, e.g.*, Ex. 93 (UD_0187225) ███████████████████████ Accordingly, the class is ascertainable.

## CONCLUSION

For the reasons set forth above, Plaintiffs request that the Court certify the class, appoint Plaintiffs as the class representatives and appoint their counsel as class counsel.

Dated: July 1, 2022                     Respectfully submitted,

**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**

*/s/ Robert J. Kriner, Jr.*
Robert J. Kriner, Jr. (#2546)
Scott M. Tucker (#4925)
2711 Centerville Road, Suite 201
Wilmington, DE 19808
(302) 656-2500

**BURSOR & FISHER, P.A.**
Joshua D. Arisohn (admitted *pro hac vice*)
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: jarisohn@bursor.com

20

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (admitted *pro hac vice*)
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Tel: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

**CROSS & SIMON, LLC**
Christopher P. Simon (No. 3697)
Michael L. Vild (No. 3042)
1105 N. Market Street, Suite 901
P.O. Box 1380
Wilmington, Delaware 19801-1380
(302) 777-4200
csimon@crosslaw.com
mvild@crosslaw.com

**ANASTOPOULO LAW FIRM, LLC**
Eric M. Poulin (admitted *pro hac vice*)
Roy T. Willey, IV (admitted *pro hac vice*)
Blake G. Abbott (admitted *pro hac vice*)
32 Ann Street
Charleston, SC 29403
(843) 614-8888
eric@akimlawfirm.com
roy@akimlawfirm.com
blake@akimlawfirm.com

*Attorneys for Plaintiffs*