IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE


NINIVAGGI, et al.,        )
                          )
         Plaintiffs,      )   C.A. No. 20-1478
                          )             20-1963
v.                        )
                          )
UNIVERSITY OF DELAWARE,)
                          )
         Defendant.       )



                    Friday, March 24, 2023
                    1:00 p.m.



                    844 King Street
                    Wilmington, Delaware



BEFORE:  THE HONORABLE STEPHANOS BIBAS
     United States District Court Judge



APPEARANCES:


         BURSOR & FISHER, P.A.
         BY:  JOSHUA D. ARISOHN, ESQ.

              -and-

         POULIN WILLEY ANASTOPOULO, LLC
         BY:  BLAKE ABBOTT, ESQ.

              -and-

```
APPEARANCES CONTINUED:

     CHIMICLES, SCHWARTZ, KRINER
     & DONALDSON-SMITH, LLP
     BY:  ROBERT KRINER, ESQ.

              -and-

     CROSS & SIMON, LLC
     BY:  MICHAEL VILD, ESQ.

                     Counsel for the Plaintiffs


      SAUL EWING, LLP
      BY:  JAMES D. TAYLOR, ESQ.
      BY:  MARISA DeFEO, ESQ.
      BY:  JONATHAN SINGER, ESQ.

                     Counsel for the Defendant
```

```
 1                    THE COURT:  Let me see, before we
 2      begin, is everyone here from the four plaintiffs
 3      first that we were expecting.
 4                    MR. ARISOHN:  Yes, Your Honor.
 5                    THE COURT:  Okay.  So, Mr. Aris --
 6      how do you pronounce it, Arisohn?
 7                    MR. ARISOHN:  Arisohn is correct,
 8      Your Honor.
 9                    THE COURT:  And you're here with
10      which firm?
11                    MR. ARISOHN:  Bursor & Fisher.
12                    THE COURT:  Okay.  And which other
13      firms and lawyers are here for plaintiffs?
14                    MR. ARISOHN:  Blake Abbott is here
15      from Poulin Willey.  Bob Kriner is here from
16      Chimicles.  And I see Michael Vild is on from
17      Cross & Simon.
18                    THE COURT:  Mr. Vild is from what,
19      the Cross firm?
20                    MR. VILD:  Yes, Your Honor.  Cross
21      & Simon.
22                    THE COURT:  All right.  And so one
23      from each of the four firms.  Anyone else in the
24      rooms with you whose appearances we should note?
```

4

```
1     Okay.  Very good.  Who is here for defendants?

2               MR. TAYLOR:  Good afternoon, Your

3     Honor.  Jim Taylor from Saul Ewing.

4               THE COURT:  You have a little bit

5     of an echo, Mr. Taylor.  I don't know if you can

6     do anything about that.

7               MR. TAYLOR:  Yes, sir.  Is it

8     fixed now?

9               THE COURT:  It's still echoing.  I

10    don't know if you need to maybe turn off and on

11    your mic or something like that.  Let's see if

12    there's anything you can do about that.

13    Understandable.  Welcome.

14               MR. TAYLOR:  We will do that.  And

15    joining me today are my partners Marisa DeFeo

16    and Jonathan Singer.  And then also on behalf of

17    the University of Delaware is Jennifer

18    Becnel-Guzzo who is its associate vice president

19    and deputy general counsel.

20               THE COURT:  Okay.  So three, Mr.

21    Taylor, Ms. DeFeo and Mr. Singer and all with

22    Saul Ewing.

23               MR. TAYLOR:  Correct, Your Honor.

24               THE COURT:  And Ms. Becnel-Guzzo
```

```
 1     is in-house at Delaware?

 2               MR. TAYLOR:  Correct.

 3               THE COURT:  Very good.  Were we

 4     expecting anybody else?

 5               MR. TAYLOR:  Not from the

 6     defendant.

 7               THE COURT:  All right.  This is

 8     Judge Stephanos Bibas here in Ninivaggi and

 9     Russo versus Delaware.  Our case number -- where

10     is it?  I've got numbers 20-cv-1478 and

11     20-cv-1963.  I'm joined by my law clerk, Olivia

12     Goldberg.  We have Ms. Ingram on as our court

13     reporter.  And Tyler Kohler is our courtroom

14     deputy.  Can you hear us okay?

15               MR. KOHLER:  I can hear you, Your

16     Honor.

17               THE COURT:  All right.  And Ms.

18     Ingram, is everything all right?  You're the

19     most important person in the room, so make sure

20     to let us know if you can't hear anything.

21               COURT REPORTER:  Will do.  All

22     good right now.

23               THE COURT:  Very good.  Let's get

24     started.  We're here for, I think we have just
```

```
 1    one matter on the agenda, which is a hearing on

 2    whether to certify a class, class action here.

 3    And I don't find it especially useful to have

 4    just prepared speeches from both sides.  I

 5    really would rather alternate, go issue by

 6    issue, sub-issue by sub-issue back and forth.

 7    Could you identify, Mr. Arisohn, are you

 8    speaking for plaintiffs on everything?  Are you

 9    dividing up some of the issues among counsel?

10              MR. ARISOHN:  I'll be speaking on

11    all the issues, Your Honor, for plaintiff.

12              THE COURT:  Okay.  And for

13    defendants, who will be handling what issues?

14              MR. TAYLOR:  Jim Taylor.  I will

15    be, Your Honor.

16              THE COURT:  Okay.  Very good.  So

17    let's start with threshold issues.  First of

18    all, standing.  Let me ask plaintiffs, do you

19    have to show under third circuit precedent that

20    the online education that plaintiffs got was of

21    less economic value than the in-person education

22    that they paid for in order to show injury under

23    article 3 standing?

24              MR. ARISOHN:  Well, certainly
```

1        that's our theory of the injury.  Our theory of

2        the injury is that in-person classes and access

3        to the campus were worth a certain amount and

4        that based on the work that our experts have

5        done, we know that the online version that they

6        got for part of the semester was worth 15.2

7        percent less for that period and that likewise

8        the 7 days of classes that were canceled and not

9        made up made what they received worth less.  So

10       that is our theory of the case here.

11                   THE COURT:  All right.  Let me go

12       to Mr. Taylor for defendants.  Were all enrolled

13       students required to sign the cost billing

14       financial aid statement?  That's my

15       understanding from the record.

16                   MR. TAYLOR:  No, sir.  It

17       certainly is a University of Delaware document,

18       but there is no signature called for or

19       required.

20                   THE COURT:  Okay.  Is this

21       document provided to all in coming students?

22                   MR. TAYLOR:  It's posted and made

23       available to students.

24                   THE COURT:  Is it sent or a link

```
1      to it sent to students?
2                  MR. TAYLOR:  Not certain, Your
3      Honor.
4                  THE COURT:  Is it posted in a
5      basement janitor's closet?
6                  MR. TAYLOR:  On the website.
7                  THE COURT:  On the website.  So
8      you've posted it publicly in a prominent place
9      where all perspective students might be expected
10     to see it?
11                 MR. TAYLOR:  Correct.  And I
12     believe they are pointed to it.  But Your Honor
13     asked if it was provided to them and I don't
14     know if it's actually been sent to them.
15                 THE COURT:  They are pointed to
16     it.  If that's the case, why doesn't that amount
17     to a term of the contract that is being formed
18     in which case an alleged breach of that contract
19     would support standing?
20                 MR. TAYLOR:  Two responses, Your
21     Honor, if I may.
22                 THE COURT:  Yes.
23                 MR. TAYLOR:  First, it's a very
24     high threshold level.  And Your Honor is correct
```

1    that we're here on the motion to certify today,

2    but Mr. Arisohn spoke about the expert and the

3    class-wide damage calculations that the

4    plaintiffs have proffered.  And under -- there

5    are pending before the Court or briefing is

6    pending before the Court Daubert motions with

7    respect to the plaintiff's experts.  And under

8    the Blood Reagents case, third circuit case 783

9    F 3d 183, as the Court may be aware, the Blood

10   Reagents case, as we understand it, calls for

11   Daubert to be considered when the expert

12   calculation is necessary for class-wide damages

13   to be performed in conjunction with class

14   certification review.  So I just want to start

15   there since Mr. Arisohn started by talking about

16   his experts.  That we believe those motions need

17   to be considered.

18              With respect to standing, which I

19   know is Your Honor's question --

20              THE COURT:  Right.  We'll get to

21   experts later.  I don't know that I need the

22   experts for the standing.

23              MR. TAYLOR:  I completely agree.

24   I just didn't want to miss that point since he

1    had started with experts.

2                    With respect to standing, I think

3    that the question of who would owe tuition is

4    respectfully a different issue than who has

5    standing and I certainly know and Your Honor

6    pointed us to the Little case, which said as

7    much, but the Patel case from the District of

8    Vermont in July of 2021 focused on

9    redressability.  And I think that's --

10                   THE COURT:  So you're not

11   disputing injury in fact or causation.  Because

12   I want to pinpoint what part of the Little

13   versus Grand Canyon you disagree with.  Had the

14   students suffered an injury in fact by losing

15   access to in-person classes and instead getting

16   online classes?

17                   MR. TAYLOR:  Certainly we disagree

18   with that premise, but --

19                   THE COURT:  Could they plausibly

20   assert it for constitutional standing purposes?

21                   MR. TAYLOR:  If the question is

22   have I they asserted it, I think the answer to

23   that is yes.

24                   THE COURT:  And causation, do you

1    have a basis to dispute that they have a

2    plausible assertion of causation for standing

3    purposes?

4                 MR. TAYLOR:  No.

5                 THE COURT:  Okay.  So the focus at

6    the standing stage is on redressability,

7    correct?

8                 MR. TAYLOR:  Correct.  I'm also

9    going to get a little bit to proof.  But yes,

10   for redressability, the Patel case focused on

11   redressability and involved two different

12   students who for different reasons had not

13   actually paid tuition to the university in

14   question there.  And the Patel case stands for

15   the proposition that because of that, the

16   redressability was a barrier to certification.

17                THE COURT:  Precedence could do

18   two things to a court.  They can bind me if they

19   come from the supreme court or third circuit,

20   but none of these does.  Or they can persuade

21   me.  What reasoning in the Patel case ought to

22   persuade me of that?

23                MR. TAYLOR:  I believe that where

24   you have a situation where a student has not

```
 1      paid, has not come out of pocket at all for

 2      tuition, that there could not be an injury in

 3      fact and it could not be remedied.

 4                  THE COURT:  Oh, so now you're not

 5      disputing redressability, now you're disputing

 6      injury in fact?

 7                  MR. TAYLOR:  I would submit that

 8      that may go to both, I guess.  Again, I said in

 9      the beginning I disagree with the premise that

10      there was an injury in fact.  I certainly agree

11      that some students could have alleged it or have

12      alleged it here.  But with respect to a student

13      who hasn't paid anything, I'm not sure there's

14      an injury in fact, even if --

15                  THE COURT:  Let me give you an

16      example.  Let's say some parents get their

17      child, on graduating from high school, a Ford

18      Mustang.  Okay.  They give it to the child and

19      the Ford Mustang is a lemon, okay?  The whole

20      reason to get a Mustang is it goes zero to 60 in

21      5 seconds and this one goes put, put, put, chug,

22      chug, chug.  Would Ford have any ability to say

23      the student suffered no injury in fact because

24      he could use the car just like it was a jalopy
```

```
 1    even though it can't move like a Ford Mustang

 2    just because he hasn't paid for it?  Would you

 3    argue that student had suffered no injury in

 4    fact?

 5                    MR. TAYLOR:  I think not in that

 6    case.

 7                    THE COURT:  Well, this is that

 8    case.  You charged much more for in-person

 9    education than for online education.  They got

10    something of lesser value.  At least it is

11    plausibly alleged that they did.  I don't see

12    the basis for arguing no injury in fact.  It's

13    like you gave them a jalopy.

14                    MR. TAYLOR:  Okay.  Certainly we

15    believe and Your Honor also has pending briefing

16    for a motion on summary judgement where we walk

17    through those issues.  And just to make clear on

18    the record, there is not substantially less and

19    in many cases not less charged at all for online

20    tuition.

21                    THE COURT:  But they have

22    plausibly alleged that and that's all they need

23    at this stage.

24                    MR. TAYLOR:  I would respectfully
```

```
1     submit, it's not all they need at class

2     certification.  It's more than a pleading

3     standard.  But for standing purposes, I

4     understand where Your Honor is and I understand

5     those questions.

6                    THE COURT:  Okay.

7                    MR. TAYLOR:  So I conflated

8     perhaps injury in fact and redressability.  But

9     so you asked what's persuasive out of the Patel

10    case, where you have an individual or a student

11    who has not come out of pocket and has not paid

12    anything and where the remedy sought is a

13    refund, the Patel case stands for the

14    proposition that where you have not paid

15    anything out of pocket and you're remedy you're

16    seeking is a refund, that is not enough.  There

17    are third parties who have interests at stake.

18    Your Honor, for example, found in the motion to

19    dismiss that the parents, since dismissed, but

20    that the parents would have standing, for

21    example.  That the court in Patel said that

22    because the students were not -- could not be

23    refunded the money in that situation, there was

24    a redressability problem and that's why
```

1    standing.

2              THE COURT:  Well, the named

3    plaintiffs here, most of them have taken out

4    loans.  They're on the hook.

5              MR. TAYLOR:  And I mentioned, if I

6    may, that there was also, I thought, an

7    evidentiary issue.  So the plaintiffs say that

8    they've taken out loans and the only thing they

9    point to for that are ironically documents the

10   University of Delaware produced, our account

11   statements that show there were loan payments.

12   But what the Court does not have before it at

13   all is any evidence about the nature of those

14   loans, the documents supporting those loans, who

15   took them out, the amount of the overall loans,

16   et cetera.  And so I just need to point out

17   again where it's the plaintiffs burden, I don't

18   think Your Honor has an evidentiary record that

19   supports fully what that loss would be.

20             THE COURT:  Now, your previous

21   argument and the previous opinion was the

22   parents didn't have standing and now you're

23   saying the children don't have standing.  So is

24   it that nobody has standing?

```
1                    MR. TAYLOR:  For a refund -- no,

2       sir.  For a refund where a student hasn't paid,

3       I think that's different from saying no one has

4       standing.  For where the student hasn't paid,

5       that's a different calculus.

6                    THE COURT:  Wouldn't that go to

7       the measure of damages rather than to whether

8       there's standing?

9                    MR. TAYLOR:  I think the issue is

10      that because we're here on the plaintiff's

11      proposed class and how they've sought to define

12      the class, that's why it relates to standing

13      here.

14                   THE COURT:  Okay.  So you're not

15      saying that there wouldn't be standing, it's

16      just because you're saying the class definition

17      might include some people who don't have

18      standing?

19                   MR. TAYLOR:  I'm not certainly not

20      saying there could never be standing.  And to

21      take an example, a student who paid, I imagine

22      this happened, a student who paid a hundred

23      percent out of his or her pocket for tuition, I

24      think that leaving aside all our other arguments
```

1    and defenses, that individual would have

2    standing.

3              THE COURT:  Let me let our

4    courtroom deputy know, by the way, that I don't

5    think we're going to have any witnesses hear, so

6    Mr. Kohler, you're free to leave.

7              MR. KOHLER:  Thank you, Your

8    Honor.

9              THE COURT:  Let me ask you this

10   Mr. Taylor.  So there are cases from the supreme

11   court that talk about the need for the named

12   plaintiffs to have standing.  And so why would

13   it torpedo the case if the named plaintiffs have

14   standing if it might be the case at the end that

15   some people ultimately fall out because they

16   can't show -- maybe the people who got full

17   scholarships from the University of Delaware, if

18   a few of those people lacked standing, why would

19   that torpedo the whole case?

20             MR. TAYLOR:  No, Your Honor.  That

21   was focused on individual plaintiffs.  So I was

22   talking about issues with the class overall and

23   why we're talking --

24             THE COURT:  We're right to focus

1    on the named plaintiffs here and their standing,

2    correct?

3              MR. TAYLOR:   Agreed.   And one of

4    them paid nothing out of pocket and three, the

5    other thing they pointed to are loans, but again

6    that's simply an amount from a University of

7    Delaware statement.   It says nothing about the

8    source of the repayment obligation.

9              THE COURT:   Say these four

10   plaintiffs -- I mean, I know some of them are

11   not in Delaware anymore.   Let's say back when

12   they still were at Delaware, they stopped paying

13   for the spring of '21 or fall of '20 or whatever

14   it is.   You would have come after them for

15   breach of contract lawsuit and you would have

16   pointed to that provision on the website to say

17   that they're on the hook too, not just their

18   lenders, right?   You're client definitely does

19   not want to deny that, because it's far more

20   important to your client to make those same

21   assertions towards future students who don't

22   pay, correct?

23              MR. TAYLOR:   The short answer to

24   Your Honor is yes, the students would be

```
1      financially responsible.  I would submit that
2      it's actually far less common for universities
3      to go after students than we might expect for
4      that, but nevertheless, I agree.  And that's why
5      I said at the beginning I understand that Little
6      stands for that proposition.  And of course as
7      Your Honor pointed out, not binding.  I
8      understand Little stands for that proposition.
9      I just think it asks the wrong question.  Who is
10     responsible for tuition in the event that it's
11     not paid versus where the redressability would
12     actually relate to.
13                THE COURT:  Okay.  Let's put covid
14     aside.  Let's imagine University of Delaware was
15     in financial distress and decided half way into
16     spring 2017 it was going to cancel all classes
17     for the rest of the semester.  Would anyone have
18     standing to sue and if so, who?
19                MR. TAYLOR:  I think an individual
20     student who came out of pocket would have
21     standing to sue in that event.  Your Honor has
22     also found, we disagree, but Your Honor has
23     found that a parent would have standing in that
24     event as well.
```

1          THE COURT:  Okay.  I think this

2    case is like the lemon example.  There are

3    plenty of cases out there where someone who

4    receives a gift can sue and I think you are

5    correct that it might effect the measure of

6    recovery or how the money is conveyed, maybe

7    some of the money you paid over might be

8    impressed with a constructive trust or the

9    person who gave it, but I don't see how this

10   deprives them of standing themselves, especially

11   since almost all students presumably are going

12   to have themselves be residually on the hook in

13   this situation.  So I think it may go to some

14   damages issues.  I think you're free to remain

15   to litigate those, but I'm going to find that

16   these students have standing.

17          Let's move on to ascertainability.

18   Mr. Taylor, if we define the class to include

19   all enrolled students other than those who

20   received full scholarships directly from the

21   University of Delaware, would the class be

22   ascertainable?

23          MR. TAYLOR:  Your Honor, would you

24   give me the end of that one more time, please?

 1            THE COURT:  Okay.  Let's say

 2    plaintiffs define their class to include all

 3    enrolled students at the University of Delaware

 4    and carved out those who got 100 percent

 5    scholarships from the University of Delaware.

 6    Would that class be ascertainable?

 7            MR. TAYLOR:  Two things, Your

 8    Honor.  Number one, we're here because it's the

 9    plaintiffs burden and I don't think they've met

10    that and the reason why I believe that is

11    because Your Honor started with all enrolled

12    students, which -- or enrolled in classes, which

13    I think was the plaintiffs language, right?

14    That is surprisingly vague and overbroad in and

15    of itself, because as Your Honor would be aware,

16    there's a drop/add period at some point,

17    students leave and can get refunds.

18            THE COURT:  Okay.

19            MR. TAYLOR:  And as written that

20    would be overly broad and include those.

21            THE COURT:  All right.  Let's say

22    we tweaked it is to all students who remained

23    enrolled at the end of the drop/add period for

24    that semester, because March 2021 hit after the

1    drop/add period had ended, correct?

2              MR. TAYLOR:  I think that's

3    correct.

4              THE COURT:  Okay.  So if we define

5    the class that way, would it be ascertainable.

6              MR. TAYLOR:  We still run into, we

7    believe, the issue with paid tuition because

8    Your Honor carved out in your hypothetical those

9    who had full -- essentially full rides.  But we

10   know, for example, that one of the named

11   plaintiffs here received a third-party

12   scholarship and we think that would not be

13   included.  If you had an individual, for

14   example, whose tuition was fully paid with

15   third-party scholarships, we think that

16   individual should not be covered as well.

17             THE COURT:  Okay.  I think that

18   collides with my ruling on the lemon Ford

19   Mustang hypo, so you can continue to dispute

20   that.  You've got an issue preserved if you want

21   to appeal it, but I don't see how, if you have

22   standing over the Mustang, you don't have

23   standing in that situation.  Now, what I want to

24   know is, exhibit 18 in DI 95-2 shows that you

1    know exactly which students received money from

2    U Delaware, correct, that's in your records?

3                    MR. TAYLOR:  We would know which

4    university students received money from the

5    University of Delaware.

6                    THE COURT:  And you could figure

7    out which of those got 100 percent scholarships?

8                    MR. TAYLOR:  Correct.

9                    THE COURT:  Okay.  Very good.  I

10   think the ruling on ascertainability --

11                   MR. TAYLOR:  Forgive me.

12   Scholarships, yes, a university of Delaware

13   scholarship, if we're limiting it to that.

14                   THE COURT:  If we limit it to

15   University of Delaware scholarships.  I think

16   then the standing -- the ascertainability issue

17   hinges on the same thing as the standing issue.

18   You conceded injury in fact and ultimately it

19   comes down through redressability.  And if a

20   donees injury is redressable in an ordinary gift

21   case, I think the same reasoning has to apply

22   here, that for the same reason there is

23   standing, there's also ascertainability.  So,

24   you know, I don't see how there could be

```
 1      standing, but it wouldn't be ascertainable.  It

 2      would just go to whether there's no standing in

 3      the first place and I find the Little versus

 4      Grand Canyon case persuasive, so I'm going to

 5      find ascertainability in my written opinion.

 6               Let's go to rule 23(a).  Now, I

 7      have to say, Mr. Taylor, you're briefing

 8      disputed every last fact in this case and I

 9      don't find that an especially persuasive

10      rhetorical technique.  Do you dispute numerosity

11      here?  Is there any reason to question there's

12      more than 40 students who can make these claims?

13               MR. TAYLOR:  Your Honor, we tried

14      to say to Your Honor exactly that.  We

15      understand that there may very well be a

16      numerous class here and certainly a number of

17      students enrolled would be numerous.  We point

18      to and this is a common theme you'll hear from

19      me over and over, a failure of proof by the

20      plaintiffs.  And again, Your Honor, has probably

21      already addressed this in connection with

22      standing and the ascertainability issue because

23      I think those largely collide or run together,

24      but that was the point, right.  If the
```

1     plaintiffs have not identified who is actually

2     part of the class and the plaintiff themselves

3     might not be, then that would be for

4     ascertainability and even to a degree,

5     typicality.  The reason why we preserved that

6     issue.

7                    THE COURT:  Okay.  So numerosity

8     is not an independent objection here, it goes to

9     the same like -- that in theory this could be

10    numerous enough, but you're just contesting

11    whether they've provided enough evidence that

12    more than 40 are involved?

13                   MR. TAYLOR:  Correct.  Absolutely.

14                   THE COURT:  Can we take judicial

15    notice that there are thousands of students

16    enrolled at the University of Delaware or were

17    enrolled in the spring of 2020?

18                   MR. TAYLOR:  We said as much

19    including in that section, Your Honor, that

20    there were 17,000 students give or take.

21                   THE COURT:  I don't see how it

22    wouldn't be numerous, I think ultimately this

23    just collapses down to the, you know, the issues

24    of proof that you're talking about.

```
 1                    Commonality.  So plaintiffs theory
 2        that I allowed to proceed past the motion to
 3        dismiss stage is that there's a common set of
 4        representations being made your website, that
 5        they cite in the complaint, and that these
 6        appear to apply to all the students who were
 7        enrolled in in-person education for that
 8        semester, at least the ones you've mentioned
 9        made it past add/drop.  Fine.  We can say made
10        it past add/drop, but presumably by March they
11        would have made it past add/drop so, what would
12        deprive this class of commonality?
13                    MR. TAYLOR:  Two things.  And
14        commonality, as I understand it when we're
15        certifying under B3 predominance, commonality
16        gets sort of subsumed into predominance, so
17        forgive me if I start talking about both,
18        because it's how I'm thinking about them.
19                    THE COURT:  Okay.
20                    MR. TAYLOR:  But two main points.
21        Number one, their common class wide damages,
22        which are an aspect of their claim, are
23        associated with the experts and as I mentioned
24        earlier, that's why I think it's part and parcel
```

```
1     under Blood Reagents.
2                   THE COURT:  All right.  I think
3     that's more a predominance issue that there
4     might be some common liability issues, but
5     you're concerned that the damages issue swamp
6     that?
7                   MR. TAYLOR:  I think it relates to
8     the commonality as well, because it's the only
9     method of damages or the only measure of
10    damages, I should say, put forth by the
11    plaintiff.
12                  THE COURT:  Is there commonality
13    on the liability theory, though?
14                  MR. TAYLOR:  So the second piece
15    is on the liability.  And I think the answer to
16    that is no, Your Honor.  So with respect to
17    implied contract, I would submit that the
18    plaintiffs have focused on the university's side
19    of the equation, but not the requirement for a
20    meeting of the minds.  There has to be intent
21    and mutual ascent and that's Capital Management
22    versus Brown, Delaware supreme court case.  I
23    see Your Honor nodding, so I'll move on, but --
24                  THE COURT:  I know this is
```

1    objected theory of contract and none of their

2    arguments are premised on so and so got an

3    e-mail from the registrar, so and so had a

4    private conversation with the dean of students.

5    They're premised on stuff that was on the

6    website, in the handbooks.  There's nothing

7    individualized here about that.  They're just

8    saying that these formed -- there theory wasn't

9    formed express terms.  I wasn't willing to go

10   quite that far, but I said there's at least an

11   implied terms generated by -- plausibly, not on

12   the merits, but plausibly alleged and plausibly

13   shown with some evidence created by the

14   representations on the website and the handbooks

15   and all of that.

16              MR. TAYLOR:  And if you look, Your

17   Honor, and what they actually point to in their

18   motion for certification, it's not quite as

19   broad as Your Honor just put it.  They attached

20   a number of web page printouts, major

21   descriptions at the University of Delaware.

22   It's only about 20 some of 150 majors, number

23   one.  And again, keeping in mind, plaintiffs

24   bear the burden of proof here, evidentiary

1    burden, not just the pleading standard.  And

2    those are pages and we point this out in our

3    brief, those are pages from 2022, so there's no

4    evidence before Your Honor that those are even

5    pages from Spring of 2020.  There was no

6    response in the reply brief to that.

7                    THE COURT:  Mr. Arisohn, did you

8    not even go back to the way back machine to get

9    the 2020 pages?

10                   MR. ARISOHN:  I believe most of

11   them are from the way back machine, but I'll

12   have to come back to you with that if necessary.

13                   THE COURT:  Okay.  Why don't you

14   dig that up while we're talking to Mr. Taylor

15   and perhaps you can tell me something about that

16   a little later on the call or one of you can

17   have a paralegal looking at this while we

18   continue.  Mr. Taylor, please go on.

19                   MR. TAYLOR:  Yes.  And so then the

20   next point in connection with that is that none

21   of the plaintiffs themselves -- and if Your

22   Honor looks at the declarations that are

23   attached from the plaintiffs to the plaintiff's

24   motion for certification, none of them actually

1   relate to or say anything about those web pages.

2   They don't say I looked at those or relied upon

3   them.  They don't say anything --

4                  THE COURT:  This is not a

5   detrimental reliance theory.  This is an

6   objective contract.

7                  MR. TAYLOR:  But they don't --

8   sorry, Your Honor.  But they don't even say they

9   looked at them.  They don't even go to that

10  step.  All they say is I registered for an

11  in-person course.  And I would submit,

12  respectfully, that's not enough at this stage to

13  just say I registered for an in-person course.

14                 THE COURT:  I think if that

15  student hadn't paid the money and you were suing

16  them and they tried to say they hadn't looked at

17  the manual that says you're on the hook for the

18  fees, you'd say tough luck, it's an objective

19  contract.

20                 MR. TAYLOR:  I think under the

21  earlier document that we were talking about,

22  which is very different than the implied theory

23  that they're pursuing here.

24                 THE COURT:  Okay.  Fair response.

```
 1                    MR. TAYLOR:  And if I may --

 2                    THE COURT:  Yes.

 3                    MR. TAYLOR:  So -- and just

 4     because you're hearing from me first, so as I

 5     understand the plaintiffs, they have two

 6     different theories, if that's the right word.

 7     One is the conversion from in-person to online

 8     is worth less.  Obviously we disagree with that,

 9     but that's their theory.  And that goes to, I

10     think, a lot of what we were just talking about

11     in connection with the web pages, declarations,

12     we think it's insufficient as a matter of

13     evidentiary record.  The second theory, as I

14     understand it, is that the students, quote, lost

15     out on a week.  Seven days.  It adds up to seven

16     days.

17                    THE COURT:  I'm going to ask them

18     about that later, because that is popping up

19     very late in this case.  So I'm not sure it's in

20     the case.  But tell me to the extent it is in

21     the case why you think that bears on

22     commonality.

23                    MR. TAYLOR:  Yes, sir.  And we've

24     challenged that in connection with the summary
```

1    judgment briefing that's briefed before the

2    Court.  But the reason why I mentioned for

3    commonality is because none of what we just

4    talked about goes to the seven day issue, I

5    would submit.  And on the seven day issue, as I

6    understand the plaintiff's argument, it's you

7    had a calendar that showed the semester going

8    from X to Y and the seven days of that education

9    was not provided in a form of classes and so

10   their calculation, you'll see this in connection

11   with the experts in the Dauberts, their

12   calculation is every day is worth the same, so

13   prorate tuition for those seven days.  I don't

14   think that warrants it for commonality for the

15   reasons that I just mentioned earlier in terms

16   evidentiary that was lacking, but in particular

17   here because the students would have all had

18   very different scenarios and individualized

19   situations for those seven days.  You know --

20            THE COURT:  Let me stop you there,

21   because I have a question for Mr. Arisohn about

22   that.  I was going to cover it later, but the

23   seven days aren't mentioned in your complaint.

24   Why should I let you bring that claim for the

```
 1    missed days of classes?  Your complaint is
 2    entirely about the loss of value from remote
 3    education.  I don't see that that's in this
 4    case.
 5                 MR. ARISOHN:  I'm looking at the
 6    consolidated class action complaint that was
 7    filed on September 3rd.  It's ECF docket entry
 8    19.
 9                 THE COURT:  Okay.  Let me open up
10    the complaint here.  I've got a copy of it.  And
11    where are my bookmarks?  Amended complaint.  So
12    tell me where in the complaint I should look.
13                 MR. ARISOHN:  On page 23 in
14    paragraph 94.
15                 THE COURT:  Okay.
16                 MR. ARISOHN:  We reference --
17                 THE COURT:  Had no plans to offer
18    via online delivery.  That intention is
19    evidenced by the fact it had to cancel classes.
20    That's using that as a piece of evidence that
21    they didn't intend to offer in-person class.
22    It's not making a claim based on that.
23                 MR. ARISOHN:  Well, I think the
24    broader view of the claim is that the education
```

```
 1     they paid for changed.

 2               THE COURT:  Yeah, but I'm going to

 3     hold you to the way you framed your complaint.

 4     So I think, you know, Mr. Taylor has some

 5     commonality issues here about this, but even if

 6     it were common, I just -- I think we're too far

 7     down the road to be adding that in.  I mean, the

 8     gravamen, the thrust of your complaint is they

 9     went remote.  The previous opinion was all about

10     they went remote.  There was nothing in the

11     motion to dismiss about the extra seven days.

12     This is the first I'm hearing of it.  And like,

13     look, it's a clever point you make about the

14     back path of paragraph of 94, but in context

15     that's not what the complaint was about, so I

16     don't see how I'm going to allow that.

17               MR. ARISOHN:  Your Honor, to be

18     fair, the specifics of those canceled days came

19     out late in the discovery process.

20               THE COURT:  Okay.  Well, then

21     there should have been a motion to amend to add

22     that and there wasn't and that should have

23     justified it.  I think we're too far along to

24     add that in.  But setting that aside, I find
```

1    that the core issue here has a certainly a bunch

2    of commonalities on liability.  I'm going to

3    come back to damages when we get to

4    predominance.  I think Mr. Taylor has more to

5    work with their, but numerosity and commonality

6    I find both satisfied.

7              Let's talk about tipicality and

8    start with Mr. Arisohn.  Let's talk about

9    plaintiff Hannah Russo.  Defendants argue that

10   she chose to leave University of Delaware.

11   Another student got covid.  She went back to her

12   mom's place and this was before the school

13   decided to cancel classes.  So is there a

14   defense, a waiver that's unique to her that

15   would suggest that she's not typical?

16             MR. ARISOHN:  I don't think so.  I

17   think this was a time of panic for many people

18   as we probably all remember and I don't think it

19   was unreasonable for her to go home.  It didn't

20   mean she was going home necessarily for the rest

21   of the semester.  At that point nobody had any

22   idea how long any of the craziness was going to

23   last.  So she easily could have come back in a

24   few days if everything had quieted down.  But it

1      was literally a day or two before the school

2      told everyone to go home anyway.  So I think

3      it's really hard to read so much into that.

4                  THE COURT:  Okay.  Mr. Taylor, as

5      I said, there's something to what you argued,

6      but Ms. Russo's mom lived an hour away.  It's

7      not like she went across the country.  It was

8      just for a day or two.  And she asserts

9      plausibly that she would have come back.  Why

10     shouldn't I credit that as at least sufficient

11     to get, you know, get class certification, get

12     past summary judgment?  Couldn't a jury believe

13     her.

14                 MR. TAYLOR:  We think it purely --

15     and we stand by the argument that purely creates

16     individualized issues for her that are unique to

17     the class and make her atypical.

18                 THE COURT:  Well, there's no

19     typicality issue with any of the other named

20     plaintiffs, is there?

21                 MR. TAYLOR:  Well, I'm not sure.

22     They conceded, three of them, that the

23     university did not promise in-person education.

24                 THE COURT:  I don't know -- well,

1    look, let's get to -- well, I'm not -- when I

2    read their statements in context, it reads like

3    they're saying look, I can't point to an express

4    promise, but I still understood I was supposed

5    to get an in-person education.  So I don't -- I

6    don't know that you would take what a layman

7    says in those settings as a concession that

8    there's no legally binding obligation or

9    agreement here.

10              MR. TAYLOR:  I would suggest, Your

11    Honor, that again, keeping in mind plaintiff's

12    burden of proof here and the evidentiary burden,

13    I mean, that is their statement under oath.  I

14    understand how Your Honor reads it, but there's

15    nothing embellishing it or adding to that in

16    their declarations other than to say as I read

17    it, or read them, we registered for in-person

18    classes.

19              THE COURT:  Yeah.  Look, if I

20    thought they were being weasly or contradicting

21    themselves, I would agree with you.  It looks

22    sincere at the very least, you know what, a

23    reasonable jury or fact finder I think would

24    find that it was sincere.  I think the same

1    thing about plaintiff Hannah Russo.  It's not

2    like she went and moved all her stuff home and

3    everything else.  Just going to her mom's for a

4    day or so, you know, or right before, it's quite

5    plausible that she would have resumed in person

6    classes.  So I don't think you have anything

7    there.

8              Now, I think there's more for us

9    to discuss when we get to the adequacy issues

10   here.  And I want to spend some time on

11   adequacy.  So first let's talk about adequacy of

12   the class representatives.  Mr. Taylor, I'll

13   start with a question for before I go to

14   plaintiffs.  Do you see any conflicts of

15   interest here between the class representatives

16   and the rest of the class?  Anything you want to

17   point me to?

18             MR. TAYLOR:  No, sir.

19             THE COURT:  All right.  Let me go

20   to Mr. Arisohn.  So in the depositions we have

21   some named plaintiffs who contradict their

22   written responses.  You know, exhibit 46,

23   Ninivaggi admits three of his responses were

24   incorrect, including whether he was enrolled at

1    University of Delaware.  Some of the other named

2    plaintiffs admitted that their written answers

3    are wrong.  You know, doesn't that suggest maybe

4    the plaintiffs aren't credible, they're not

5    adequate.  How do you explain these basic

6    mistakes?

7             MR. ARISOHN:  Well, Your Honor, I

8    think when we went through interrogatory

9    responses from them, we, as lawyers, were able

10   to recognize that questions were being asked in

11   certain ways that had spin attached to them and

12   that deserved answers that were appropriate in

13   that way.  And I think in a deposition, without

14   fully understanding all the implications there,

15   they tend to be more agreeable.  I don't think

16   any of those responses warrant anything that go

17   to the heart of this issue.  None of them have

18   said, you know, I thought I was going to an

19   online university the whole time or anything

20   like that.  I think it's really just nitpicking

21   here there, but none of them are critical

22   issues.

23             THE COURT:  Okay.  You know what,

24   I do have concerns.  What assurances do we have

```
1        that they're going to, you know, thoroughly

2        represent the class and fairly do that?  I mean,

3        this is just --

4                       MR. ARISOHN:  Well, Your Honor, if

5        I could just speak to that.  They've been

6        engaged in this case, certainly.  They have been

7        in regular communications with us.  They

8        reviewed the complaint and other documents

9        before they got filed.  They prepped with us for

10       depositions and sat through lengthy depositions

11       where some of them were subject to what I would

12       call some harassing questions frankly.  They

13       collected documents and they've kept apprised of

14       this case.  And I think that's all that is

15       required have them.  And they all understand

16       their role in this case.  They all understand

17       that they are acting not just on behalf of

18       themselves but as a class as a whole and they

19       want to do what's best for the class as a whole

20       and they've promised to do that and I have no

21       reason to doubt that they'll continue to do

22       that.

23                       THE COURT:  Okay.  Let me see.

24       There's a Mr. Doolittle joining.  Does anyone
```

1      know who he is?

2                    MR. ARISOHN:  Yes.  He's my

3      co-counsel.

4                    THE COURT:  Okay.  All right.

5      Welcome, Mr. Doolittle.  Paul Doolittle, he's

6      with about Bursor & Fisher.

7                    MR. ARISOHN:  Poulin Willey, Your

8      Honor.

9                    THE COURT:  Okay.  Poulin Willey.

10     Got it.  All right.  So -- and let me ask you a

11     follow up question even though this hops back a

12     little on typicality.  One of the things that

13     University of Delaware says is these plaintiffs,

14     that the students were harmed in different ways,

15     different degrees.  They say some plaintiffs

16     might have preferred online learning, some

17     students might have.  What do you say to that?

18                    MR. ARISOHN:  That's not how we're

19     looking at damages here.  The damages that we're

20     measuring are based on objective market prices.

21     There was a market price that the University of

22     Delaware was charging to students for its

23     in-person version, in-person classes and access

24     to the campus.  We conducted a conjoint survey

1    and analysis, our expert did that and he was

2    able to compare and find out that the market

3    price for the online version is worth 15.2

4    percent less.  So in the but for world, if

5    students had been given the opportunity to buy

6    that online version, market forces would have

7    worked in a way that the price would have been

8    15.2 percent less.  And so that applies to

9    everybody across the board.  It doesn't matter

10    if they preferred online classes or if they

11    never went to class at all.  That's the way

12    these things work.

13             And the example that comes to me

14    with these kinds of arguments is a car with a

15    convertible top function.  Let's say the car

16    costs, you know, 50,000 and the convertible

17    option costs an extra $5,000.  Let's say you get

18    home, the convertible top doesn't work for

19    anybody.  You're injury doesn't depend on

20    whether you could use the top every day or once

21    in a while or never.  Everybody paid $5,000

22    extra for that convertible option and none of

23    them got that.  And so regardless of their

24    unique circumstances, they all paid $5,000

1    dollars too much in that situation and it's the

2    same thing here.  All the students paid a market

3    rate for one thing and they got something else

4    that had a lower market value.

5                    THE COURT:  Okay.  Mr. Taylor, let

6    me hear your response to that.

7                    MR. TAYLOR:  Your Honor, and

8    forgive me, you'll be tired of hearing me refer

9    to the Blood Reagents case, but this is exactly

10   why I started there.

11                   THE COURT:  Okay.  So let me pull

12   of Blood Reagents since you're such a fan of it

13   and let's look at it together.  Give me that --

14   if I can find that.

15                   MR. TAYLOR:  Did you ask me for

16   the cite, Your Honor?

17                   THE COURT:  Is that third circuit?

18                   MR. TAYLOR:  Yes.

19                   THE COURT:  Third circuit 2015 783

20   F 3d 183?

21                   MR. TAYLOR:  Yes, sir.

22                   THE COURT:  Okay.  Judge Scirica.

23   My wonderful colleague.  So direct me to where

24   in the Blood Reagents case you'd like me to

1      look.

2                    MR. TAYLOR:  So I have the

3      printout in front of me that looks like it is on

4      page 187.

5                    THE COURT:  Okay.  Is that after

6      the subheading B?

7                    MR. TAYLOR:  It is exactly at

8      subheading B.

9                    THE COURT:  So direct me to what

10     passage here.

11                   MR. TAYLOR:  The language that

12     immediately follows subheading B.

13                   THE COURT:  All right.  We joined

14     certain of our sister courts to hold that a

15     plaintiff cannot rely on challenged expert

16     testimony to demonstrate conformity to 23,

17     unless the plaintiff also demonstrates that

18     expert testimony satisfies the standard set out

19     in Daubert, though lots of people turn it into

20     Daubert.  Rigorous class certification.  So

21     what's the need for the expert testimony here?

22     Mr. Arisohn says it's like the car with the

23     faulty convertible top.  Why is the expert

24     testimony essential to plaintiffs?

1             MR. TAYLOR:  Because that's where

2       that comes from.  You heard Mr. Arisohn talk

3       about the market component and he might have

4       mentioned this word, but this is the descriptor

5       of it.  It's called a conjoint analysis.  And

6       just for 10 seconds, on our Daubert motion Your

7       Honor will see in that that we believe that's

8       wholly inappropriate to use in this context.

9       We'd submit it has not been used in the higher

10      ed context for valuing tuition before and it is

11      used as a market tool, to sort of decide what

12      type refrigerator or dishwasher parts are used.

13             THE COURT:  Let's imagine I toss

14      all that stuff out.  Let's say I exclude every

15      piece of expert testimony.  I look at your

16      website and your charging higher fees for

17      in-person than online.  Why isn't that enough to

18      get past class certification on summary

19      judgment?

20             MR. TAYLOR:  I would submit -- I

21      go back to, we're not.  And Your Honor will see

22      in summary judgment that there's actually not

23      the disparity between in person and online that

24      Your Honor is imaging.  There certainly are in

1          some instances, but it's not across the board

2          and it's not sort of the more versus less.

3                    THE COURT:  You're saying there

4          are some groups of students for whom in person

5          and online had the same charges?

6                    MR. TAYLOR:  Correct.

7                    THE COURT:  Which groups of

8          students?

9                    MR. TAYLOR:  I believe, although

10         admittedly it's in the summary judgement motion,

11         so it's not entirely fresh in my mind, but I

12         believe the point is that if an undergraduate

13         student enrolled in an online course as just one

14         course along with other in-person courses that

15         that student is paying the same tuition amount

16         and not a differential for --

17                    THE COURT:  For a single course.

18         But anyone who is enrolled full time or half

19         time is still paying the same tuition?

20                    MR. TAYLOR:  Correct.

21                    THE COURT:  At most that would

22         call for me to narrow the class to those who

23         take more than one class?

24                    MR. TAYLOR:  Haven't had a chance

1    to think about that, but I understand the point.

2               THE COURT:  Mr. Arisohn, why

3    shouldn't I narrow your class slightly to

4    require it people who are enrolled for more than

5    a single class in that semester?

6               MR. ARISOHN:  I'm sorry, is that

7    to avoid students who took online classes?  Is

8    that the point?

9               THE COURT:  If they took a single

10    online class that semester, Mr. Taylor

11    represents that the charge was the same.  So I

12    mean, look, there's this issue about experts.

13    Maybe your expert has enough to show that it's

14    worth less, but if I don't bind the expert,

15    shouldn't I then narrow the class to be those

16    who at least had two or more classes?  Now,

17    defendants are in possession of the information.

18    I presume Mr. Taylor will agree.  You've got

19    information about who was enrolled for one class

20    versus more than one class that semester,

21    correct?

22               MR. TAYLOR:  Certainly.

23               THE COURT:  Okay.

24               MR. ARISOHN:  Even online classes

1      at the University of Delaware during a normal

2      semester are different in character from what

3      students got in the second half of spring 2020,

4      most notably because of the campus access.

5      That's a huge part of going to college, going to

6      the quad, going to classes, putting the classes

7      aside, so it's not really an apples to apples

8      comparison.  Two different products there.

9                  THE COURT:  Mr. Taylor, could I

10     infer from the fact that most of the products

11     were priced separately, that consumers make a

12     distinction in choosing one or the other and

13     often choose the more expensive product because

14     they prefer it such that even those who took

15     just one class at that price might not have paid

16     the same amount for the potentially inferior

17     online alternative?

18                  MR. TAYLOR:  I believe no, Your

19     Honor.  I think that requires an individualized

20     assessment, which is why the plaintiffs have

21     sought this market conjoint approach and why we

22     think it's so wildly inapplicable.

23                  THE COURT:  Again, let's go to the

24     Mustang versus Jalopy.  There are a few

```
 1        collectors out there who prefer the old jalopy
 2        to fix it up.  But normally in contract analysis
 3        we just look at the way the market behaves and
 4        much of that is reflected in the price, but the
 5        fact that you've got something that is different
 6        in a material respect could well be enough to
 7        establish a breach.  Now, as to the measure of
 8        damages, that's going to depend on I think in
 9        all the other cases of students, it's an easy
10        measure of damages and they may not be able to
11        prove any damages for the people who had one,
12        but again, that just suggests that some of the
13        class members might drop out at the damages
14        stage and I'm presuming it's a small minority of
15        people who are enrolled for just one class, so
16        why do I need to deal with it at this stage?
17                  MR. TAYLOR:  I think it goes back
18        to the individualized assessment.  And again
19        this may be a piece of where I'm continuing to
20        talk about predominance than where Your Honor is
21        focused, but I really do think that's where it
22        falls apart.  The plaintiffs have proffered the
23        only measure of damages being this market based.
24        They've tried to avoid talking about what the
```

```
 1        individual students preferred, because what we
 2        know is that nearly all of the students who were
 3        still undergrads in spring of 2020 enrolled --
 4        re-enrolled in fall of 2020 when it was still
 5        online.
 6                    THE COURT:  That's kind of an
 7        unfair assessment.  I mean, that's true of lots
 8        of places.  But if you said okay, you can take a
 9        gap in your education for a few years, very few
10        universities are open in fall of 2020, or you
11        can just suck it up.  That doesn't -- you can't
12        infer from that that the students were just as
13        happy getting the online where there's no
14        in-person alternative available most places at
15        least in the area, in the fall of 2020.
16                    MR. TAYLOR:  I respectfully
17        disagree that it's not an apt description, but I
18        understand where the Court is on that.  I would
19        focus back on again, plaintiff's burden to
20        proffer the evidence here.  The only evidence
21        they've proffered about common damages is this
22        challenged market study.
23                    THE COURT:  Okay.  Now, you
24        wouldn't dispute -- I took judicial notice of
```

```
 1        Governor -- I guess it was Governor Carney's
 2        order shutting things down and that's
 3        appropriate, correct?
 4                    MR. TAYLOR:  To take judicial
 5        notice of it?
 6                    THE COURT:  Yeah.
 7                    MR. TAYLOR:  Correct.
 8                    THE COURT:  And I could take
 9        judicial notice that in most of the surrounding
10        states -- I know in Pennsylvania and New Jersey,
11        for example, that there were some similar
12        shutdown orders in effect.
13                    MR. TAYLOR:  I'm sure that Your
14        Honor could take the same judicial notice of
15        those states as Delaware.  You're going to hear
16        me say broken record, but it's plaintiff burden
17        before the Court.
18                    THE COURT:  I got that.  I got
19        that.  I think on adequacy of plaintiffs, they
20        have done enough, but I think some of the issues
21        you try to raise really go to predominance and
22        I'm still not at predominance, so don't -- you
23        don't need to apologize for being a broken
24        record, I'm just trying to structure this a
```

1    piece at a time.

2              I think there's a more serious

3    concern here about adequacy of counsel and it's

4    good that we have the four law firms on here.

5    So as I understand on it, there are four

6    different law firms currently involved in this

7    litigation, but the only lawyer on the

8    plaintiff's class certification and the motion

9    for summary judgment brief appears to be Mr.

10   Kriner, correct?  So should I appoint him lead

11   counsel according to plaintiffs?  Let me hear

12   from plaintiff's side, why or why not?

13             MR. ARISOHN:  Thank you, Your

14   Honor.  Mr. Kriner and his firm, Chimicles, have

15   been helping us with this case as Delaware

16   counsel along with Cross & Simon.  I know it's

17   typical that even in many districts that even

18   when attorneys like myself are admitted pro hoc,

19   that the Delaware counsel or the counsel within

20   the district are the ones signing all the

21   documents.  In terms of who -- what the roles

22   are in the case and I guess this goes to your

23   points 1 and 2, to the order that you issued

24   this week, my firm, Bursor & Fisher is one

```
 1        that's been taking the lead in this litigation.
 2                    THE COURT:  Explain what you mean
 3        by taking the lead.  What things have been
 4        concretely drafting, interviewing,
 5        investigating, all of that?
 6                    MR. ARISOHN:  We had the first
 7        filed case.  We did all the pre-suit
 8        investigation.  I'm sure Poulin Willey did a
 9        similar investigation before they filed what was
10        their separate case, the Russo case.  But since
11        consolidation, Bursor & Fisher has been in
12        charge of overall strategy in terms of reviewing
13        documents and requesting discovery and reviewing
14        discovery responses.  We've taken the bulk of
15        the depositions and done the bulk of the
16        briefing.
17                    THE COURT:  Okay.
18                    MR. ARISOHN:  And Poulin Willey
19        has been in a support role on all of those
20        fronts and then Chimicles and Cross & Simon, as
21        I said, have been Delaware counsel and they've
22        been very helpful in helping us navigate
23        litigation in this district.
24                    THE COURT:  Okay.  So that's three
```

```
 1       firms, but there are four here.

 2                    MR. ARISOHN:  No, I think I

 3       mentioned them all.  I'm Bursor & Fisher.

 4                    THE COURT:  How about Cross &

 5       Simon?

 6                    MR. ARISOHN:  They are also

 7       Delaware counsel.

 8                    THE COURT:  Okay.  So we have two

 9       local Delaware counsel, is this because of the

10       artifact of having two cases that were

11       consolidated, each case started with a local

12       counsel and out of state counsel that was taking

13       the lead?

14                    MR. ARISOHN:  That's correct.

15                    THE COURT:  And since

16       consolidation, Chimicles has been filing the

17       papers, but Bursor & Fisher has been doing most

18       of the work.  I'd like to hear from those two

19       other firms whether Poulin Willey and Cross &

20       Simon agree with the characterization you've

21       just heard or think would put a different spin

22       on the matter.

23                    MR. VILD:  Your Honor, this is

24       Michael Vild from Cross & Simon.  I think that
```

1    it's fair to say that the four firms have been

2    working as a team.  There's some items that the

3    Russo firms have managed and I think that Mr.

4    Arisohn's characterization of his firm taking

5    sort of the laboring more is correct, but I

6    think all four firms have been, you know, sort

7    of working as a team on this matter.

8              THE COURT:  Okay.  I'd like to

9    understand -- and you know, and it's appropriate

10   for me to ask about this looking out for the

11   plaintiffs' interest.  Ultimately I wouldn't be

12   awarding fees unless and until there were a

13   verdict and a settlement, but are the fee

14   arrangements such that the plaintiffs will wind

15   up recovering less because of the presence of

16   four firms than they would if there were only

17   two firms involved?

18             MR. ARISOHN:  I don't think our

19   arrangement is based on who is appointed lead or

20   not.  So --

21             THE COURT:  Are there to be shares

22   of either whatever, you know, percentage or you

23   know, you know, the loads are getting computed

24   based on the numbers of hours each person is

```
1    working?  I just would like to understand how

2    the math works out so I can assure myself that,

3    you know, it is ultimately both in the public's

4    interest and in plaintiffs' interest for four

5    firms versus two firms to continue here.

6              MR. ARISOHN:  In terms of, you

7    know, compensation on our side, it's not

8    something that's going to be impacted by the

9    leadership appointment necessarily.  If I could

10   just speak to the practice of appointing four

11   firms, it is a fairly common practice.  I'm

12   happy to provide the Court with cites on that if

13   you're so inclined, but we discussed the issue

14   obviously earlier this week and our back up

15   position would be for the Court to appoint

16   Bursor & Fisher and Poulin Willey as co-lead

17   counsel given that we're the most experienced in

18   class actions, in these tuition/covid cases in

19   particular.

20             THE COURT:  Okay.  Talk to me

21   Bursor & Fisher's experience in class actions

22   generally.  Mr. Arisohn, would you be named lead

23   counsel for your firm?

24             MR. ARISOHN:  I know some courts
```

```
 1     appoint firms, some courts appoint individual

 2     attorneys.  If you're inclined to appoint an

 3     individual attorney, that would certainly be me.

 4               THE COURT:  Okay.  So it's not

 5     necessarily.  Then talk to me about your and I'm

 6     talking about your firm's experience in class

 7     actions generally before we get to tuition cases

 8     specifically.

 9               MR. ARISOHN:  Sure.  We've been

10     appointed lead counsel and interim class counsel

11     in many dozens of cases.  There have been -- our

12     firm resume has been provided to the Court.

13     We've won six of six class action jury trials

14     for hundreds of millions of dollars.  We've

15     recovered billions of dollars for class members.

16     I think at least now this is everything --

17     everything we do is a class action.  So we have

18     a lot of experience in that realm and a lot of

19     success.

20               THE COURT:  Okay.  And then

21     about -- so talk to me about tuition refund

22     cases.  How many have you done and at what

23     stages are those?

24               MR. ARISOHN:  I don't remember
```

```
 1      exactly how many we originally filed.  It was
 2      several dozen.  Many of them have settled.  Some
 3      are still ongoing.  Personally, I'm working on
 4      six that are pending before the Court of Claims
 5      in Ohio regarding public institutions there and
 6      so I could speak to those most intimately.
 7      Those were certified and then remanded for the
 8      Court to address certain issues and so those
 9      cases are ongoing.
10               THE COURT:  All right.  Should I
11      hold against adequacy of counsel generally that
12      plaintiffs made misstatements of some pretty
13      elementary facts that I'm presuming come from,
14      you know, careless drafting on the lawyers' part
15      and not taking enough time to interview their
16      clients?
17               MR. ARISOHN:  Such as which?
18               THE COURT:  Oh, well, whether Mr.
19      Ninivaggi was enrolled and, you know, the
20      various things they admitted at the depositions
21      that Mr. Taylor's team elicited.
22               MR. ARISOHN:  You know, mistakes
23      happen, but we went through all of those with
24      our clients.  And, you know, sitting here right
```

```
1        now I can't tell you for each one, you know,

2        what the problem was.

3                        THE COURT:  Okay.  If I certify

4        this, I'm going to hold you to a higher

5        standard, okay?  I don't -- this is not just

6        certify you as adequate and be done.  I

7        expect -- I expect more thorough or professional

8        work going forward.

9                        MR. ARISOHN:  Understood.

10                       THE COURT:  All right.  Now, did

11       you correct the inaccuracies in the requests for

12       admission that came out during the depositions?

13                       MR. ARISOHN:  With supplemental

14       responses?

15                       THE COURT:  Yes.

16                       MR. ARISOHN:  We did not.  It was

17       not requested from us.

18                       THE COURT:  Okay.  Mr. Taylor, let

19       me hear you spoke to the adequacy of counsel

20       here.

21                       MR. TAYLOR:  Sure, Your Honor.  I

22       mean, we put it in the papers in connection with

23       our concerns and I think Your Honor has put the

24       finger on the fact that we think there were some
```

```
1       real deficiencies in terms of and this goes back
2       to the issue of proof and evidence.  There was a
3       paltry production of less than a hundred pages
4       total for the case for all four firms for all
5       four plaintiffs.  The incorrect, and putting it
6       charitably, incorrect testimony, no corrections.
7       And again, where the plaintiffs have the burden,
8       the burden is not on us to ask for corrections.
9       The burden is on -- I'm sorry, the reality is is
10      that it's our opportunity to point that out as
11      an adequacy issue and we think that goes to both
12      the class representatives and counsel.
13                THE COURT:  Okay.  All right.
14      Hold on just a moment.  All right.  One last
15      thing.  You know, I do have this case in front
16      of us from New York and I guess I'll ask Mr.
17      Abbott.  So the Poulin Willey Anastopoulo firm
18      did not make a good impression on Judge McMann
19      in SDNY and I'd like to know your response to
20      that as to why this case is different.
21                MR. ABBOTT:  Your Honor, this case
22      is different because the issues that arose in
23      that one are not what happened here.  We didn't
24      have instances in which there was inconsistent
```

```
 1      testimony.  There weren't instances where there
 2      were multiple requests to extend multiple
 3      deadlines.  Here we complied with the existing
 4      deadlines.  We produced the documents and, you
 5      know, we did our job in this case.  We did
 6      exactly what it was that we were required to do.
 7      I don't think that the same issues arise in this
 8      case.  We do disagree with the ultimate finding
 9      by that judge.  However, even the issues raised
10      in that one do not exist in this case.
11                  THE COURT:  Okay.  I think there's
12      been better disclosure in this case and there
13      were some -- there's more of what looked like
14      dishonesty in that case.  I don't know -- Mr.
15      Taylor, is there any basis for me to read what
16      happened here as more than sloppiness and to
17      read it as dishonesty?  I haven't seen it, but
18      I'd like to know if you think there's anything
19      that's better understood that way.
20                  MR. TAYLOR:  No.  I have no reason
21      to suggest that, Your Honor.
22                  THE COURT:  All right.
23                  MR. TAYLOR:  I pointed out, you
24      could call it, the testimony dishonesty, but if
```

```
1      you're asking about counsel and representation.
2                       THE COURT:  Yeah.  I don't see
3      dishonesty, I see sloppiness and a sloppiness
4      that I will not tolerate going forward.  And I
5      let plaintiffs know this.  And I think that even
6      if it happens going forward, it will reflect
7      poorly on you and on the amounts that I allow
8      you to recover as counsel.  So I advise you to
9      take care.
10                      But I will find that both
11     plaintiffs and counsel are adequate.
12                      Superiority shouldn't take us too
13     long.  Again, I'm bracketing predominance for
14     last.  Let me ask, Mr. Taylor, for purposes of
15     superiority, are there any other pending
16     lawsuits against U Delaware arising from its
17     move to online learning, is there any reason not
18     to find this the superior way to resolve these
19     disputes?
20                      MR. TAYLOR:  In answer to the
21     first question, no, there are no other current
22     lawsuits.
23                      THE COURT:  Okay.  And answer to
24     the second?
```

1          MR. TAYLOR:  In answer to the

2     second question, I think it is, and I agree,

3     largely subsumed within predominance, even

4     though it's a separate factor.  But I do

5     think -- I think it's the Sulfolk University

6     decision is instructive in finding that although

7     the other elements were met, that because of the

8     individualized issues, that it didn't satisfy

9     the superiority, but I don't have more to state

10    in what that court found.

11          THE COURT:  Okay.  Right.  I think

12    the heart of this case comes down to

13    predominance.  I think predominance is the

14    hardest issue here and it just makes sense now

15    to tackle it at the end.  I think I hit all the

16    other factors.  If anyone thinks I've overlooked

17    one, please let me know, but I've been trying to

18    go down the list.

19          But at predominance, I think the

20    best -- the hardest issues here are about the

21    relationship between liability and damages,

22    because I think Mr. Taylor has some points that

23    might suggest that some students might not

24    recover at all, some students might recover

1    less, some might recover more, it might depend

2    in part on who funded as to whether a full

3    restitutionary amount is called for or a lesser

4    amount and so let's spend a little time on this

5    one.  So let me start, Mr. Arisohn.  So in the

6    Vega case, the 11th circuit said class actions

7    rarely are appropriate for unjust enrichment

8    claims.  The Eastern District of Pennsylvania

9    said something similar in Hernandez versus

10   Ashley Furniture.  Why should I treat this case

11   as the exception not the rule, the rare case?

12            MR. ARISOHN:  Right.  Well, as

13   Your Honor just noted, even Vega says it's not a

14   blanket rule.  And in the review that I've

15   conducted of courts that are addressing whether

16   unjust enrichment claims should be certified,

17   the cases really fall into two separate

18   categories.  And it depends on the nature of the

19   transaction or the conduct at issue

20   unsurprisingly, where there were separate

21   circumstances surrounding the transactions or

22   the conduct or was it really the same for

23   everybody.  And where there are separate

24   circumstances, unsurprisingly, there are going

1    to be individual issues that cause problems for

2    predominance there.  So in Vega itself, the

3    compensation structures for the employees varied

4    by business channel and by positions.  So you

5    just weren't going to be able to figure out the

6    commissions and whether they were withheld on a

7    common basis.  Individuals were necessarily

8    going to be problematic.  Likewise in Hernandez

9    v. Ashley Furniture, there was no common

10   evidence as to whether employees were paid for

11   their rest breaks or their meals.  It was

12   necessarily going to require an individual

13   inquiry.

14                But there's this whole other set

15   of cases that hold that when there's a uniform

16   course of conduct, common issues do predominate

17   and unjust enrichment can be certified.  So if I

18   could just point to a couple of those.  There's

19   one case, Connor v. Permanent General Insurance

20   Corp from the Southern District of Florida last

21   year and that's 2022 Westlaw 1642866.

22                THE COURT:  Spell the case name?

23                MR. ARISOHN:  C-O-N-N-O-R versus

24   Permanent General --

```
1                    THE COURT:  Vernon?  V-E-R --

2                    MR. ARISOHN:  Permanent.  It's

3          from April 11th, 2022.

4                    THE COURT:  Okay.  And so what

5          about that case is relevant?

6                    MR. ARISOHN:  So in that case all

7          the insurance purchasers in the class were

8          charged the same and proper fee.  And the Court

9          said yes, we know what Vega says about unjust

10         enrichment class certification, but here we

11         can't conceive of any significant equitable

12         differences between class members.  And then I,

13         quote, rather all the evidence in this case

14         suggests that defendant's business practices are

15         the same to all members of the punitive class

16         and therefore any finding of liability would be

17         uniform across the class.  And there are many

18         cases that followed.  Just a couple other

19         examples quickly.  There's MacDonald v. Cashcall

20         from the District of New Jersey, 333 frd 331.

21         That case involved the same allegedly defective

22         loan agreements and again the case said well,

23         this is going to be the same for everybody and

24         certified the unjust enrichment claims.
```

```
1              THE COURT:  Okay.  Did Connor and
2     MacDonald or any other case find predominance
3     for an unjust enrichment claim?
4              MR. ARISOHN:  Well, they certified
5     the class.
6              THE COURT:  They certified, so
7     they did find predominance?
8              MR. ARISOHN:  Yeah.
9              THE COURT:  Okay.
10             MR. ARISOHN:  And then there's a
11    case that --
12             THE COURT:  Do you have the
13    citations on that?  Okay.  Could you repeat the
14    citations for Connor versus Permanent General
15    Assurance Corporation and then the MacDonald
16    case?
17             MR. ARISOHN:  The Connor v.
18    Permanent General is 2022 WL 1642866.
19             THE COURT:  And you said that was
20    April 11th, 2022?
21             MR. ARISOHN:  Correct, Your Honor.
22             THE COURT:  And what district?
23             MR. ARISOHN:  In the Southern
24    District of Florida.
```

```
 1                    THE COURT:  Okay.  Great.  You got

 2        that Olivia?  And the other the MacDonald case?

 3                    MR. ARISOHN:  MacDonald v.

 4        Cashcall is 333 frd 331 from 2019 in the

 5        District of New Jersey.  And I just have one

 6        more here.

 7                    THE COURT:  Did you get that?

 8        Wait.  333 frd -- what was the page citation?

 9                    MR. ARISOHN:  The --

10                    THE COURT:  Wait a second.  I

11        think I see.  I see October 21st, 2019.  Is that

12        the one?

13                    MR. ARISOHN:  I don't have the

14        dates.

15                    THE COURT:  But you have it as 333

16        frd and what's the starting page?

17                    MR. ARISOHN:  331, MacDonald v.

18        Cashcall, Inc.

19                    THE COURT:  Okay.  District of New

20        Jersey.  That might be this one on Google

21        Scholar here.  Looks like they certified the

22        class, so I see it from Judge Rouleau.

23                    MR. ARISOHN:  I saw from your

24        order that I might be working with Westlaw and
```

```
 1        you're working with Lexus.
 2                    THE COURT:  I'm on Google Scholar
 3        for the moment, but we can get onto either of
 4        the others.  What's the third case?
 5                    MR. ARISOHN:  This is one that my
 6        firm worked on.  Famular v. Whirlpool.
 7                    THE COURT:  Spell the first one.
 8                    MR. ARISOHN:  F-A-M-U-L-A-R.
 9                    THE COURT:  Versus whirlpool.  Is
10        this one of the smelly washer cases.
11                    MR. ARISOHN:  No.  It's an Energy
12        Star case.
13                    THE COURT:  Okay.  One of the
14        Energy Star cases.  What's the citation for
15        that.
16                    MR. ARISOHN:  2019 Westlaw
17        1254882.  And that's Southern District of New
18        York, March 19th, 2019.
19                    THE COURT:  March 19, 2019.  You
20        have all three of those?  Okay.  Very good.  So
21        they all found predominance on an unjust
22        enrichment claim.
23                    MR. ARISOHN:  Right.  So in
24        Famular the Court said everyone paid a price
```

```
1      premium for washing machines that were
2      mislabeled as Energy Star.  The unjust
3      enrichment claim, predominance satisfied because
4      everyone's unjust enrichment claim is going to
5      succeed or fail based on common evidence.  At
6      least one court in these covid tuition cases has
7      held that these cases fall into that latter
8      category.  So I would point the Court to
9      Eddlemon v. Bradley University.  That's
10     E-D-D-L-E-M-O-N.  And the citation is 2022
11     Westlaw 3227865 from the Central District of
12     Illinois, which certified an unjust enrichment
13     class.
14                THE COURT:  You got that one?
15     Okay.
16                MR. ARISOHN:  And I think the
17     Bradley case makes sense, because the unjust
18     enrichment claim, just like the contract claim,
19     is based on the same set of facts for the entire
20     class.  The University of Delaware held itself
21     out as an in-person university to everybody.  It
22     wasn't having separate negotiations with every
23     student.  Wasn't telling some students that they
24     could use the library and some they couldn't.
```

1     There's a standard uniform course of conduct

2     here.  And critically this gets back to the

3     damages issue, the equities here are the same

4     for all the students because the unjust

5     enrichment claim here is really based on the

6     fact that they all overpaid.  They paid the

7     market value for an in-person version of the

8     University of Delaware and instead they received

9     an online version, which was worth 15.2 percent

10    less.  And that's going to be true no matter

11    what, regardless of what they read, what anyone

12    told them, what they heard or saw or understood

13    or preferred, the market value of what they

14    received was less than the market value of what

15    they paid for.  And so there's no scenario in

16    which one class member's unjust enrichment claim

17    here is going to turn out differently from

18    anyone else's.  They either all of them paid or

19    they didn't.

20              THE COURT:  Now, will you likewise

21    concede then for unjust enrichment purposes we

22    can take the university's expenses as an

23    aggregate across all students?

24              MR. ARISOHN:  I don't think -- I

1     know this was discussed a little bit in the

2     motion to dismiss briefing, the unjust

3     enrichment -- our theory of unjust enrichment I

4     don't think it relates at all to their expenses.

5                      THE COURT:  But if I found

6     differently --

7                      MR. ARISOHN:  Yes.

8                      THE COURT:  If I found that their

9     expenses were relevant, would you then concede

10    that I don't have to do an individualized

11    analysis of the expenses, that I can take the

12    expenses over the student body as a whole and

13    divide by the number of students who are in the

14    relevant like undergraduate program or whatever

15    it is and just do that as a figure that you're

16    not going to come back and say hey, wait a

17    second, they didn't provide individualized proof

18    that they spent this much on this student?

19                     MR. ARISOHN:  I don't think that

20    would be necessary.  I don't think there's any

21    evidence in the record that I'm aware of that

22    they spent anything first of all.  They made one

23    reference as to Zoom licenses.

24                     THE COURT:  Okay.

```
 1                    MR. ARISOHN:  But if they did,

 2          there's certainly no evidence that they spent

 3          more on any individual student.

 4                    THE COURT:  Then you're not going

 5          to argue that they needed to prove an

 6          individualized amount they spent as opposed to a

 7          global amount they spent on HVAC and professors

 8          and they don't need to add up this professor's

 9          salary was this and this professor's salary was

10          that.  You're not going to come back and make an

11          inconsistent argument later if I certify this

12          class?

13                    MR. ARISOHN:  No.  No.  I'm

14          looking at how things went class wide.

15                    THE COURT:  I can hold you to

16          that?

17                    MR. ARISOHN:  Yes.

18                    THE COURT:  I can estop you on

19          that?

20                    MR. ARISOHN:  Yes.  If I could

21          just make one last point on unjust enrichment.

22          I really don't think it makes sense to certify

23          the contract claim here but not the unjust

24          enrichment claim.
```

```
 1              THE COURT:  Right.

 2              MR. ARISOHN:  Because I think they

 3      are intricately linked in several ways and given

 4      the way they're pled, they're not really wholly

 5      independent.  First of all, they're based on the

 6      same facts.  I already talked about that.  But

 7      the reality of the situation is that the unjust

 8      enrichment claim here is pled in the

 9      alternative.  And realistically what that means

10      is that if the contract claim ends up being

11      barred under the doctrine of impossibility --

12      and I know we're not arguing summary judgment.

13      We argue in our opposition to summary judgment

14      why we don't think that should be the case, but

15      if it is, the case law and the restatement on

16      contracts are clear on what should then happen.

17      What happens is that the contract is dissolved

18      and then the parties to that contract are

19      entitled to offsetting restitution under theory

20      of unjust enrichment.  And that at the end of

21      the day is really the basis for the unjust

22      enrichment claim here, that there was a

23      contract, which performance was impossible, so

24      the practical result of that ends up being
```

```
 1        really what's the proper measure of damages; is
 2        it contract damages, expectation damages or is
 3        it restitution damages?  Here that probably
 4        doesn't make a difference.  But what follows is
 5        that if the contract claim is certifiable, and
 6        we think it is, then the unjust enrichment claim
 7        really has to be certifiable too, because the
 8        unjust enrichment claim is premised on the
 9        existence of the contract claim.  And instead,
10        if we have a situation where only the contract
11        claim is certified and that gets barred under
12        impossibility and the result is that there's no
13        more class wide relief, that's just not the
14        right result because every party to that
15        contract, all the class members in that
16        situation would be entitled to restitution and
17        they're not individual issues that change them.
18                  THE COURT:  Okay.  So going back
19        to this, like how granular these determinations
20        are, what would you say if Mr. Taylor were
21        arguing that well, some student used a lot of
22        health services or other services and costed
23        Delaware more money than normal, would that
24        defeat predominance.
```

```
 1              MR. ARISOHN:  That the university
 2     spent more to educate them?
 3              THE COURT:  Particular students.
 4     You know, that particular students were very
 5     needy, they went to the health services a lot,
 6     some of them got sick, is that going to make
 7     these issues not predominant?
 8              MR. ARISOHN:  Well, first of all,
 9     I would say there's no evidence of that and
10     there's very clear case law saying that
11     speculation alone doesn't defeat predominance.
12     So the reason for that is you can always come up
13     with some conceivable situation that's going to
14     effect one person and not another.  But there's
15     no evidence of that here.  The other answer to
16     that is even if that does come up in some
17     instance, predominance doesn't mean that there's
18     no individual issues.  It means that common
19     issues predominate over the individual issues.
20     And I think the common issues here, the ones
21     that are at the core of this case, you know, if
22     there's some one offs or something, I'm sure the
23     Court is, you know, very capable of dealing with
24     that kind of a thing at a trial.  I just don't
```

```
 1        see any reason to believe that's going to start

 2        overwhelming the common issues here.

 3                    THE COURT:  Right.  Okay.  Let me

 4        go to Mr. Taylor now.  So Mr. Taylor, let's talk

 5        about the implied contract claim and then let's

 6        talk about the restitution separately to the

 7        extent that that calls for something separate.

 8        So with the implied contract claim, you've

 9        argued that, you know, implied contract requires

10        individualized inquiry depending on what is

11        subject to the expectations, but isn't it fair

12        to assume each student pays to go to college,

13        you know, we have an objective test of the

14        contract, objective meeting, not a subjective

15        meeting of the minds and each students expects

16        their classes will be in person because none of

17        the proof here depends on e-mail from a

18        particular administrator to a particular student

19        or anything like that.

20                    MR. TAYLOR:  As I mentioned

21        earlier, Your Honor, no, we don't think that's

22        right.  Your Honor certainly pointed us to the

23        Dickey's BBQ case and the Data Breach scenario

24        and I think that's a good comparison to what we
```

1    have here.  In the Data Breach case, I don't

2    think there would be really any question about

3    mutuality of the consent, but here where, again,

4    plaintiffs have the burden for proof and where

5    the only thing the plaintiffs say is as Your

6    Honor just put it, they registered for in-person

7    classes, I just don't think that's enough.  I

8    understand and I've heard everything Your Honor

9    has said today and I know where that may be

10   headed, but I respectfully don't think that's

11   enough.

12             THE COURT:  Okay.  Isn't the

13   question of whether Delaware promised to provide

14   in-person classes, isn't that an issue that's

15   common to all class members?  Before we get to

16   damages, just was there a promised

17   representation made in modes like the website

18   that are just public and common to everybody?

19             MR. TAYLOR:  So I think that's the

20   fundamental problem here.  The plaintiffs are

21   not pointing to something that says see, look

22   here, here's the promise and of course Your

23   Honor has already said that in connection with

24   there is no express promise, but they don't even

1   point to and draw a connection between the

2   university saying classes are ordinarily in

3   person or will be in person or anything like

4   that.  They point to -- instead they point to

5   these amorphous statements in some, on some web

6   pages and don't even draw the link to what

7   plaintiffs themselves looked at.  Again, I made

8   that argument earlier and we stand by it.

9             THE COURT:  Okay.  Isn't a

10   impossibility defense going to dominate for

11   implied contract?  I mean, Governor Carney's

12   order was common to everybody.

13             MR. TAYLOR:  Well, I think so,

14   Your Honor.  And at the risk of misreading Your

15   Honor's motion to dismiss opinion, that's how we

16   read it.  In fact, it's been kind of a candidly

17   and open question on our minds in terms of

18   what's really left of the implied contract case

19   if the impossibility defense really does apply

20   and whether we really are just talking about

21   unjust enrichment.

22             But with that said, Mr. Arisohn

23   just talked about how essentially they are

24   different sides of the same coin, if that's a

1     way to think of it in terms of implied contract

2     and unjust enrichment if the contract claim is

3     out either because it just fails on its own or

4     impossibility, then unjust enrichment would be

5     the alternative.  The reason why they have an

6     issue with respect to that and why I believe the

7     expert issues are so intertwined here is because

8     the experts proffered by the plaintiffs only

9     calculated this market difference.  And they

10    both testified, and Your Honor will see this in

11    the Dauberts, that they were not asked to and

12    did not create any unjust enrichment

13    calculation.  So there isn't one for class-wide

14    purposes.  And I heard Mr. Arisohn and I may

15    have also heard Your Honor talk in terms of the

16    university offering proof.  I'd submit that the

17    proof that's required there for enrichment has

18    to come from the plaintiffs and there's nothing.

19    There's no evidence at all of that in the

20    record.  They didn't even seek to procure that

21    evidence.  And their only measure of class-wide

22    damages again is this market analysis that we've

23    attacked in the Daubert.

24              THE COURT:  Uh-huh.  Okay.  On the

1       implied contract case, I mean, Dickey's BBQ

2       found predominance satisfied, so what makes this

3       case different?

4                   MR. TAYLOR:  It's the point that I

5       made a bit ago about in a data breach where an

6       individual going to a restaurant and the

7       restaurant loses the data, it doesn't create the

8       same questions in our view that exist here in

9       terms of mutuality and expectations.  Doesn't

10      turn on, for example, what food they bought,

11      what service they expected to receive, how long

12      they were in the restaurant, how often they go

13      to Dickey's BBQ.  Those kinds of individualized

14      facts that I think do matter here.

15                  THE COURT:  You know, when I look

16      at whether there's a contract, it looks common.

17      I look at impossibility, it looks common.  I

18      have a hard time seeing how there's not

19      impossibility with a contract, so then we're in

20      unjust enrichment land.  And I think the hard --

21      and Mr. Arisohn has conceded he's, you know, as

22      to what the university spent, he's not going to

23      make any different arguments, he's got a legal

24      argument that that's not the right measure and

```
 1      the right measure is what the objective value

 2      was to each student.  But I think the really

 3      hard question about predominance here is what

 4      the measure of recovery is in unjust enrichment,

 5      so let me hear you, Mr. Taylor, and let me hear

 6      you, Mr. Arisohn, talk about why, if one student

 7      paid for it himself and I'm willing to treat, by

 8      the way, taking out loans just the same as

 9      paying cash.  One student paid for it himself

10      and another student had it all paid for by, you

11      know, Daddy Warbucks or rich uncle or something

12      like that or maybe it's all third party

13      scholarships that aren't loans to the person,

14      whether that measure of damages is different and

15      if so, is the difference enough to defeat

16      predominance.  So Mr. Taylor, why don't you take

17      a shot at that.

18                  MR. TAYLOR:  All right.  I'll try.

19      I think that the problem with unjust enrichment

20      claims, and this is what you see throughout the

21      cases, is that they do require an individualized

22      balancing that you don't have on contract claim.

23      And so Your Honor has pointed us to an earlier

24      and found persuasive the Little case.  You'll
```

```
1      see that in the Little case the Court certified
2      the contract claim, but said that there was no
3      predominance for the unjust enrichment claim.
4      So very similar circumstances.  And why?
5      Because of the necessity -- I'm reading from the
6      case -- because of the necessity of examining
7      the circumstances of a particular case before a
8      court can grant a relief for such an equitable
9      claim.  And that's why these cases call for the
10     individualized assessments.  So Your Honor asked
11     a question about the tuition disparity.  Well,
12     I'll refer to it as tuition disparity or tuition
13     individual issues.  I think that goes right to
14     the heart of that and that's why that's an
15     individualized balance, because you have to
16     balance the equities.  That's part and parcel of
17     unjust enrichment.  And we can come up with
18     other examples.  I've heard Your Honor's ruling,
19     of course, in connection with Ms. Russo leaving
20     the campus voluntarily, but that's another kind
21     of analysis.  Health issue, whether somebody,
22     even if the campus had been open, would not have
23     come to campus, because of their own health
24     issues or health concerns.  Students who were
```

1       enrolled in online courses, and I know you

2       carved that out for purposes of our

3       hypothetical, but that kind of thing.  And also,

4       I do think it matters here for the balancing of

5       the equities how a student did.  Some students

6       did better online than in person.  Some

7       students, these plaintiffs -- some of these

8       plaintiffs in particular had their best ever

9       semesters.  Some students, the choice would be

10      complete the courses you're in and graduate and

11      go onto gainful employment or not.  Those are

12      all part and parcel of the balancing act that I

13      think has to come into play for unjust

14      enrichment.

15              THE COURT:  And before I go to Mr.

16      Arisohn to ask you a version of the question I

17      asked him, you don't contest that if you're to

18      make the argument that you weren't enriched at

19      all you can do that on a global basis, right?

20      You can make the argument, we spent so much more

21      money on health precautions and Zoom and webcams

22      and sanitizing and all this stuff.  You've been

23      focusing on the unjust piece, but as for the

24      enrichment piece of it, you can make that

```
1    argument entirely on a class-wide basis, right?

2    We weren't enriched, end of story.

3              MR. TAYLOR:  Correct.  The only

4    footnote I would put on that is it's not our

5    burden to make that argument.

6              THE COURT:  Not your burden, but

7    when it comes to arguing about that, you've got

8    a pretty decent argument at the summary judgment

9    stage that maybe we're not there.  Now, is there

10   record evidence to support that?  You can tell

11   me.

12             MR. TAYLOR:  Your Honor, well,

13   perhaps you're getting a preview of the summary

14   judgment that is briefed before you.  That is

15   there.

16             THE COURT:  Okay.  Mr. Arisohn,

17   why don't you respond.

18             MR. ARISOHN:  Sure.  In terms of

19   measuring damages for different students,

20   obviously if someone paid themself or through a

21   loan, that's an easy case, they should get a

22   restitution that's the difference in price

23   between what they paid for and what they

24   received.  I don't think that changes for people
```

```
 1      whose payments got -- whose tuition was paid
 2      through the parents or through a scholarship.  I
 3      think the policy that we were looking at earlier
 4      that everyone was bound to, they were looking at
 5      for purposes of article 3 standing, shows that
 6      the deal here is between the school and the
 7      students and so that refund should go to the
 8      students too.  Now, maybe do the students
 9      thereafter owe that money to their parents or to
10      whoever the scholarship came from?  Perhaps, but
11      I think that's a separate issue that we don't
12      have -- that we're not dealing with right here.
13                  THE COURT:  Do you have any case
14      law that talks about that kind of situation?
15                  MR. ARISOHN:  Not at my
16      fingertips.  I'm sure there are cases that
17      address what are essentially gifts when those
18      have to be refunded.  But there's a reason, one
19      of the article 3 arguments that I didn't get to
20      is the standing of intended third-party
21      beneficiaries.  And that's essentially what this
22      would be.  So those claimants or plaintiffs have
23      standing and presumably they're entitled to
24      damages also.
```

```
 1                    THE COURT:  All right.  Okay.
 2      Anything you want to say in response to that,
 3      Mr. Taylor.
 4                    MR. TAYLOR:  No, sir.  Nothing to
 5      add, no.
 6                    THE COURT:  Okay.  Let me pause
 7      for a moment.  All right.  I want to thank you
 8      all for your attention.  I think there were, you
 9      know, there are some genuinely hard issues here,
10      so -- in terms of predominance, but I think I'm
11      going to find that, in fact, there is
12      predominance.  There are some individualized
13      potential issues on damages based on payor, but
14      it seems to me that those will likely fall into
15      a few buckets that are manageable and the
16      liability issues all seem to me to predominate
17      on whatever back end issues there are to work
18      out.  Having said that, I also have, you know,
19      telegraphed to Mr. Taylor, that I think there
20      are real -- there are real issues here for
21      summary judgment.  And since summary judgment is
22      fully briefed up, what I'd like to do is I'm
23      going to rule on this, on class certification by
24      the end of the week.  End of next week is my
```

1    goal.  And I'd like to set down summary judgment

2    argument for April.  So I know we have Passover

3    and Easter and everything coming up in April,

4    but it will be very helpful if you could send

5    Ms. Goldberg a list of dates in, you know,

6    not -- it's not going to be next week or that

7    first week in April, but starting the second

8    week of April, dates and times when you are

9    unavailable for summary judgment.  We'll block

10   out probably two hours to be safe, even though,

11   you know, it may well take just an hour.  So why

12   don't you look at your calendars and get to her

13   about that and we'll, we'll have a hearing in

14   April, you know, certainly in the month of April

15   so that it's no less than a month after this and

16   you can all proceed accordingly.

17          I think -- I don't really see --

18   you know, we had the question about the Daubert

19   motions.  If you two could take positions on

20   what the importance is of those Daubert motions

21   for summary judgment and whether, in fact, that

22   needs to be resolved ahead of time or whether we

23   can just argue in the alternative and argue and

24   resolve both of those together.  Let me hear

```
 1        from Mr. Arisohn.

 2                  MR. ARISOHN:  I haven't really

 3        thought about it that much, but I mean certainly

 4        our damages calculations or fact of injury are

 5        potentially elements for some of the claims.  So

 6        I think that would likely come into play.

 7                  THE COURT:  Okay.  But they could

 8        be argued at the same time?

 9                  MR. ARISOHN:  Yes.

10                  THE COURT:  Okay.  Mr. Taylor.

11                  MR. TAYLOR:  Your Honor, I believe

12        and we've already seen the case Blood Reagents

13        that Daubert is required in connection with

14        class certification.  The question that's in my

15        mind is the one way intervention rule and how

16        that would come into play with summary judgment

17        and so I may need to discuss with my team and

18        maybe with Mr. Arisohn about what the

19        stagingshould be.

20                  THE COURT:  Okay.  If you feel

21        like you need to submit a letter, a joint letter

22        or two separate letters to me in a week, that's

23        okay.  I'm putting you on the spot now.  It's

24        not fair to expect an answer on the spot.  It
```

1       wasn't something I flagged for you.  But you can

2       look back to me in a week, in a three-page

3       letter or something and let me know a position,

4       any reasons why I would have concern about

5       proceeding on that one way rather than another,

6       but it does seem to me it might be most

7       efficient just to do both of those things

8       together, especially to the extent that, you

9       know, the experts are here basically about the

10      fact of the injury and about the quantum of

11      damages more than anything else.  So --

12                  MR. TAYLOR:  Yes, sir.

13                  THE COURT:  Okay.  Very good.  I

14      want to thank you all.  You've handled this very

15      professionally.  I found your briefing helpful

16      and I'm grateful for it.  And I will -- I will

17      endeavor to get you an opinion as quickly as

18      possible.  Anything else I can assist the

19      parties with?

20                  MR. ARISOHN:  Nothing from

21      plaintiff.

22                  THE COURT:  All right.  Let's say

23      next Friday by noon either a joint letter or two

24      simultaneous three-page letters to the Court

1   about your positions on resolving the Daubert

2   and summary judgment, hearing them the same time

3   and resolving them in tandem versus having to

4   sequence them and do Daubert sooner.  Thank you.

5               MR. TAYLOR:  Thank you, Your

6   Honor.

7               MR. KRINER:  Thank you, Your

8   Honor.

9               (End at 2:36 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1   State of Delaware )
                     )
2   New Castle County )

3

4

5                  CERTIFICATE OF REPORTER

6

7          I, Stacy M. Ingram, Certified Court Reporter

8   and Notary Public, do hereby certify that the

9   foregoing record, Pages 1 to 92 inclusive, is a true

10  and accurate transcript of my stenographic notes

11  taken on March 24, 2023, in the above-captioned

12  matter.

13

14         IN WITNESS WHEREOF, I have hereunto set my

15  hand and seal this 24th day of March 2023, at

16  Wilmington.

17

18

19                  */s/ Stacy M. Ingram*

20                  Stacy M. Ingram, CCR

21

22

23

24